Lewis Building and Supplies, Inc. v. Commissioner.
Lewis Bldg. & Supplies, Inc. v. Commissioner
Docket No. 3877-64.
United States Tax Court
T.C. Memo 1966-159; 1966 Tax Ct. Memo LEXIS 128; 25 T.C.M. (CCH) 844; T.C.M. (RIA) 66159; June 30, 1966
Jack Keyes, 720 N. 18th St., Bessemer, Ala., for the petitioner. Robert G. Faircloth, for the respondent. FORRESTER
Memorandum Findings of Fact and Opinion FORRESTER, Judge: The respondent determined deficiencies in the income tax of the petitioner for the fiscal years ending February 28, 1961, February 28, 1962, and February 28, 1963, in the respective amounts of $7,819.48, $7,825.81, and $2,379.68. This case presents the following questions: (1) Whether the petitioner must include in income in the year of sale portions of the purchase price of sales of residential houses where such portions designated as "share collaterals" *129 are placed in savings accounts in petitioner's name and pledged as collateral security to the extent of the amounts involved toward the payment of the purchasers' loans; (2) whether the petitioner qualified as a Subchapter S corporation during each of the years in issue. This second question is dependent in turn on: (a) whether the petitioner had two classes of stock outstanding during the years in issue; (b) whether the petitioner's election of Subchapter S for the fiscal year ending February 28, 1961, was timely filed; and (c) whether the failure of a shareholder's estate to file a consent with the district director operated to terminate the petitioner's election of Subchapter S status for the taxable year ending February 28, 1963. Findings of Fact Some of the facts have been stipulated and are incorporated herein by this reference. The petitioner filed its Federal income tax returns on an accrual basis for the fiscal years ending February 28, 1961, February 28, 1962, and February 28, 1963, with the district director of internal revenue, Birmingham, Alabama. During the years in issue the petitioner was engaged in the business of building and selling residential houses. Robert *130 T. Lewis (hereinafter referred to as Lewis) and Virginia C. Lewis (Virginia), husband and wife, and Mathew M. Laws, Jr., (hereinafter referred to as Laws) and Grace N. Laws (Grace), husband and wife, were the sole stockholders of the petitioner during the years involved. Lewis served as president and treasurer of the petitioner during the years in issue, and Laws was its secretary until his death in July of 1962. The petitioner was incorporated on February 16, 1959, with a paid-in capital of $1,000, representing 1,000 shares of common stock at $1 per share. At all relevant times Lewis held 699 shares, Laws held 299 shares and Virginia and Grace held one share each. During the years in issue the petitioner built and sold houses to private individuals. The petitioner sold about 25 percent of its houses pursuant to normal financing procedures. For the remaining 75 percent of its sales the petitioner used a special arrangement with various savings and loan associations which is hereinafter described. Under applicable Federal regulations savings and loan associations could only lend up to 80 percent of the appraised value of a house, but many of the petitioner's customers were working *131 people who could not afford to make a down payment equal to 20 percent of such appraised value. The petitioner was anxious to do business with these lower income people even though their cash resources were meager, consequently the petitioner and various savings and loan associations devised a financing arrangement whereby a loan could be made for more than 80 percent of the value of the house, provided that the petitioner would pledge the excess over 80 percent back to the association as additional collateral for the purchaser-mortgagor's performance. This was accomplished in a typical transaction as follows: Assume an appraised value of $13,750 for the house being sold and a net sale price (including $1,000 closing expenses) of that same figure. This produces an 80 percent loan potential of $11,000 requiring a cash down payment of $2,750, but the prospective buyer has only $1,250 cash so another $1,500 is needed. The closing, or loan settlement statement for this typical sale would show the amount of the first mortgage loan as $12,500, said figure being balanced by expenses of $1,000, cash to petitioner as seller $10,000, and the establishment of a "share collateral" account with *132 the mortgagee savings and loan association of $1,500. At the time of closing this typical sale, the mortgagee savings and loan association would, inter alia, issue its check for $1,500 payable to itself and to the purchaser, mortgagor, which check was immediately indorsed and the proceeds placed in a "share collateral" account in petitioner's name. This account earned "dividends" (interest) at the prevailing rate (usually 4 1/2 percent), but the mortgagee kept the passbook and petitioner had no rights as to said account except to receive any credited "dividends" before default, and as specified in the following agreement, contemporaneously made: SHARE COLLATERAL PLEDGE AGREEMENT STATE OF ALABAMA, JEFFERSON COUNTY THIS AGREEMENT made and entered into by and between CITY FEDERAL SAVINGS & LOAN ASSOCIATION, a Federally chartered corporation, hereinafter known as First Party, and [petitioner], hereinafter known as Second Party. WITNESSETH That Whereas Second Party has this day sold and conveyed to…, hereinafter called mortgagor the property located at… and legally described as follows: And Whereas in order that said sale be consummated, and at the request of Second *133 Party, First Party is lending simultaneously herewith to mortgagor the sum of [$12,500], which is being paid by mortgagor to Second Party as a part of the purchase price of said property, and First Party is taking from mortgagor a mortgage on said property to secure said loan. Now, Therefore, in consideration of the premises, and in further consideration of First Party making the aforesaid loan, the Second Party does hereby pledge to First Party as additional security for said loan his City Federal Savings & Loan Association share account numbered… in the principal original amount of [$1,500], upon the following terms and conditions: (1) On the first day of January and July of each year while this agreement remains in effect, First Party shall release from such pledged share account amounts equal to [one third] (/) of the principal reductions made during the preceding six months by mortgagor on his loan from First Party. (2) Should the aforesaid mortgage become in default and subject to foreclosure, First Party shall notify Second Party by registered mail at the last address of record in First Party's office. Thereupon Second Party shall have the right, within thirty *134 (30) days from date said notice is mailed to reinstate said mortgage by paying all lawful delinquent amounts then due thereon. Should Second Party fail to so act within thirty (30) days, then First Party may proceed with the foreclosure of said mortgage according to its terms and conditions. (3) In the event of foreclosure of said mortgage, the proceeds derived therefrom shall be applied as therein provided. Should the proceeds derived from the foreclosure sale, applied according to the mortgage terms, be sufficient to discharge the loan debt, then the pledge herein made shall be immediately released in full. Should such proceeds be insufficient to satisfy said loan, then First Party may sell the pledged share account, therefore not released, as hereinabove provided. Said sale shall be as provided by the laws of Alabama, and the proceeds from said sale likewise applied. (4) In the event of delinquency in said mortgage First Party agrees to render to Second Party all reasonable cooperation, not inconsistent with the terms hereof, in his efforts to protect his pledge. Signed, sealed, and executed, in duplicate, this the… day of…, 19 . The petitioner included in income for *135 the years in issue only the dividends credited to the "share collateral" accounts, and the portions of such accounts which it was actually allowed to withdraw under the Pledge Agreements set out above. The respondent has included in income the full amount of the "share collaterals" in the years they were respectively created and in the respective amounts of $26,113.06, $20,081.42 and $6,330.07. During 1959 Lewis and Virginia[1] advanced $12,500 to the petitioner (so that it could purchase lots and pay general operating expenses) and took its demand note which provided for interest only after a demand for payment had been made. Soon after acquiring their stock in 1960, Laws and Grace advanced $6,000 to the petitioner, for which a similar demand note was given. No demand for payment on these notes has been made and no interest has ever been paid on them. These promissory notes do not purport to change any rights or interests as to the income or the assets of the petitioner. *136 The advances in question, which purported to be loans, were in fact placed at the risk of the petitioner's business. The petitioner did not have more than one class of stock outstanding during the years in issue. On June 20, 1960, the petitioner filed a Form 2553 with the district director of internal revenue for the purpose of making an election under Subchapter S ( sections 1371, et seq.) of the Internal Revenue Code of 1954. This election purported to be effective for the taxable year beginning March 1, 1960, and ending February 28, 1961. The office of the district director rejected this election as having been filed late. On February 28, 1961, the petitioner filed another Form 2553 again for the purpose of making an election under Subchapter S. This application was accompanied by consent forms signed by all of the petitioner's shareholders, including Grace N. Laws. The petitioner was an electing small business corporation for the fiscal year ending February 28, 1962. Laws died in July of 1962, leaving a will which provided that all of his property would go to his wife, Grace. The will was probated and letters testamentary were granted to Grace on *137 September 14, 1962, but she, as such executrix, has never filed a consent in behalf of the estate for the petitioner to be treated as a Subchapter S corporation for the taxable year ended February 28, 1963. Opinion The first question is whether this accrual basis taxpayer must include in income in the respective years of sale those portions of the purchase prices of houses which were denominated "share collaterals," and placed in accounts maintained by the mortgagee in petitioner's name, but pledged as collateral security for the payment of the purchasers' loans. We answer this question affirmatively since there are none but superficial differences between the facts of this case and those involved in Key Homes, Inc., 30 T.C. 109 (1958), affirmed per curiam 271 F. 2d 280 (C.A. 6, 1959), and we can see no reason for departure from the principles there enunciated. Petitioner admits on brief that Key Homes "appears to be on all fours" with the instant case, but urges upon us the opposite result reached by Wood v. United States, ( N.D. Ala. 1964, 14 A.F.T.R. 2d 6086). We note that this case has now been reversed, United States v. Wood 352 F. 2d 522 *138 (C.A. 5, 1965). See also Bolling v. Commissioner, 357 F. 2d 3 (C.A. 8, 1966), affirming on this issue a Memorandum Opinion of this Court. The first consideration affecting petitioner's Subchapter S qualification during each of the years in issue is whether the petitioner had outstanding "more than one class of stock" during such years. Section 1371(a)(4). [2]
During 1959 and 1960 Lewis and Virginia and Laws and Grace advanced $12,500 and $6,000, respectively, to the petitioner. In exchange for these advances they received non-interest-bearing demand notes. Although these advances purported to be loans, the respondent contends that they were actually contributions to the petitioner's capital. Section 1371 of the Code provides that a small business corporation is a domestic corporation which, among other requirements not here in issue, does not have "more than one class of stock." Section 1371(a)(4). The respondent's applicable regulation provides in pertinent part that "if an instrument purporting to be *139 a debt obligation is actually stock, it will constitute a second class of stock." Section 1.1371-1(g), Income Tax Regs.
Before deciding whether the respondent's regulation is valid, at least as applied to this case, a preliminary question is whether the advances in question created a debt or an equity interest. We do not consider that an extended discussion of this debt-equity question is necessary under the facts of this case, but the following are among the principal factors which compel us to conclude that the advances were contributions to the petitioner's capital. The promissory notes did not have a fixed maturity date but were payable only upon demand. In fact demand for payment was never made. These notes did not provide for interest payable in any event, but only after demand for payment had been made. Cf. Hoguet Real Estate Corporation, 30 T.C. 580, 598-599 (1958); and Wetterau Grocer Co. v. Commissioner, 179 F. 2d 158, 160 (C.A. 8, 1950), affirming a Memorandum Opinion of this Court. No interest was ever paid or accrued. Cf. O. H. Kruse Grain & Milling v. Commissioner 279 F. 2d 123 (C.A. 9, 1960), *140 affirming a Memorandum Opinion of this Court, where advances were held to be equity rather than debt even though some interest was actually paid three years after the promissory note was issued. The capitalization of the petitioner was comparatively thin. Although the record does not indicate the debt equity ratio at the time of incorporation, at the end of the first year of operations this ratio stood at 19.5:1. By the end of the next year the ratio had increased to 32:1. Lewis and Virginia's advances were made during 1959 to help the petitioner acquire lots and meet general operating expenses. In Isidor Dobkin, 15 T.C. 31, 33 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951), we made an observation equally pertinent here: When the organizers of a new enterprise arbitrarily designate as loans the major portion of the funds they lay out in order to get the business established and under way, a strong inference arises that the entire amount paid in is a contribution to the corporation's capital and is placed at risk in the business. * * * A proportionality between the amount of shareholder advances and the percent of stock owned by the stockholders *141 is some indication that the funds were placed at the risk of the business. Lewis and Virginia owned 700 shares of stock and advanced $12,500. Laws and Grace owned 300 shares and advanced $6,000. These ratios are not exact, but exactness is not indispensable when other factors indicate equity rather than debt, and the fact that the Lewises' contribution was at the risk of the business for a longer period of time, makes the ratios here very close. Since we hold that these advances were equity rather than debt, we reach the respondent's contention that they created a second class of stock with the effect of disqualifying the petitioner as a Subchapter S corporation. Respondent does not contend that the rights of the Lewises and the Laws as holders of these promissory notes were any greater, or different from their rights as owners of the authorized capital stock, but contends simply that since these promissory notes represent equity contributions, that as a matter of law they are a second class of stock under section 1.1371-1(g), Income Tax Regs., supra. This same contention was rejected by us in W. C. Gamman, et al., 46 T.C. 1 (Apr. 4, 1966), *142 where we observed that even though the contributions there made represented equity capital they did not give the holders any rights or interests different from that owned by the holders of the nominal stock since, "The advances for which the notes were given were simply contributions of additional capital which were in reality reflected in the value of the common stock already held * * *." We consider Gamman to be indistinguishable, consequently we follow it and decide this question for the petitioner. Having decided that the petitioner did not have more than one class of stock outstanding, we now turn to alternative grounds urged by the respondent to deny the petitioner the benefits of Subchapter S for the fiscal years ending February 28, 1961, and February 28, 1963, respectively. On June 20, 1960, the petitioner filed a Form 2553 with the district director for the purpose of making an election under Subchapter S for the fiscal year beginning March 1, 1960, and ending February 28, 1961. The office of the district director rejected this election as having been filed late. Section 1372(c)(1) *143 of the Code provides as follows: An election * * * may be made by a small business corporation for any taxable year at any time during the first month of such taxable year, or at any time during the month preceding such first month. * * * The courts have interpreted this provision strictly. In William Pestcoe, 40 T.C. 195 (1963), we held that an election filed less than one month late was invalid, and in Simons v. United States, 208 F. Supp. 744 (D. Conn. 1962), an election was held to be invalid when filed only one day late. We decide this issue (which seems to have been abandoned by petitioner on brief) for the respondent. On February 28, 1961, the petitioner filed another Form 2553 with the district director's office, again for the purpose of electing to be taxed as a partnership under Subchapter S. This election was properly accompanied by consent forms signed by all of the petitioner's shareholders. The respondent does not deny that this election was effective for the fiscal year ending February 28, 1962. In July of 1962 Laws died. He left a will leaving his entire estate to Grace and naming her as executrix. Letters testamentary were granted *144 to her on September 14, 1962, but no consent form was filed on behalf of the estate. Section 1372(e)(1) of the Code provides that an effective election by a small business corporation shall be terminated "if any person who was not a shareholder in such corporation * * * becomes a shareholder in such corporation and does not consent to such election within such time as the Secretary or his delegate shall prescribe by regulations." Section 1.1372-3, Income Tax Regs., provides in pertinent part that the consent of an estate shall be made by the executor or administrator thereof and that if the new shareholder in a Subchapter S corporation is an estate, that the 30-day period prescribed for the filing of a consent, "shall not begin [to run] until the executor * * * has qualified * * *." The respondent contends that Grace's failure to file a consent in behalf of Laws' estate operates to terminate the petitioner's election for the fiscal year ending February 28, 1963. The petitioner chooses to ignore any distinction between Grace as an individual and Grace in her *145 representative capacity and argues that the consent previously filed by her as an individual shareholder should be effective to bind her husband's estate since his will provided that all of his property went to her. We observe initially that petitioner's position ignores the possibilities of either a will contest suit, or exhaustive claims by creditors, or any other circumstance which could have prevented Grace from actually getting all of Laws' stock. Often such contentions for an estate are of long duration and would not be finally resolved till long after the prescribed 30-day period for filing had passed. Thus petitioner's position is entirely impractical and unworkable. In addition, it is an established principle that a decedent and his estate are treated as separate taxable entities and different owners of the same property. In Herbert's Estate v. Commissioner, 139 F. 2d 756 (C.A. 3, 1943), affirming a Memorandum Opinion of this Court, certiorari denied 322 U.S. 752, the Third Circuit said at p. 757 that - the legislative theory has consistently been to *146 treat the estate as a new and different taxpayer whose life began when the decedent's expired. Whatever status a personal representative may have for other purposes, he is treated by the Revenue Acts as a new owner of the decedent's property for income tax purposes. * * * See also Estate of John A. Biewer [26,393], 41 T.C. 191, 197 (1963); and Estate of Ernst Zobel, 28 T.C. 885, 886-887 (1957). We decide this issue for the respondent. Decision will be entered under Rule 50. Footnotes
1. An internal conflict in the stipulation indicates that Virginia may not have participated in this contribution, but a critical reading of the entire stipulation leads us to the finding we have made.↩
2. All Code references are to the Internal Revenue Code of 1954.↩