**PORTAGE PLASTICS COMPANY, Inc.,**
**Plaintiff,**

v.

**UNITED STATES of America,**
**Defendant.**

**No. 66–C–61.**

United States District Court
W. D. Wisconsin.

June 23, 1969.

James Urdan, Milwaukee, Wis., for plaintiff.

Mitchell Rogovin, Asst. Atty. Gen., Harold J. Heltzer, Atty., Dept. of Justice, Washington, D. C., Edmund A. Nix, U. S. Atty., Madison, Wis., for defendant.

JAMES E. DOYLE, District Judge.

This is an action brought under 28 U.S.C. § 1346(a) (1) to recover United States corporation income taxes and statutory interest assessed and paid thereon for fiscal years ended May 31, 1960, through May 31, 1963, in the amount of $164,733.13 plus interest accumulated from the date of said payment. The action arises under the Internal Revenue Code of 1954.

Several issues are raised by the pleadings, but by stipulation and order the following issue was severed for separate trial: whether plaintiff qualified as a small business corporation within the meaning of Section 1371(a) of the Internal Revenue Code so as to be eligible to elect under Section 1372(a) of the Internal Revenue Code not to be subject to corporate income taxes for its fiscal years ended May 31, 1961, through May 31, 1963. Trial of this issue was had to the court. At the close of plaintiff's case defendant moved to dismiss pursuant to Rule 41(b), Federal Rules of Civil Procedure. The court reserved a ruling.

My findings of fact and conclusions of law appear in this opinion. Rule 52(a).

Most of the facts were stipulated by the parties. The stipulated facts are so found and are incorporated herein by this reference. Those stipulated facts which are necessary for an understanding of the question before the court are set forth herein together with facts found but not stipulated.

Plaintiff is a Wisconsin corporation with its principal place of business in Portage, Wisconsin. At all times here material plaintiff kept its books of account and filed its federal income tax returns on an accrual method of accounting and by fiscal years ending May 31.

Plaintiff was organized on June 1, 1957. On that date plaintiff purchased certain assets in the amount of $100,461.13, and assumed certain liabilities in the amount of $60,927.23, of the Standard Container Corporation (hereinafter Standard), an Illinois corporation engaged in both basketweaving and plastics. The assets purchased by plaintiff were connected with Standard's plastics business.

Prior to and at the time of the transaction the plastics business of Standard was a marginal operation. As of May 31, 1957, Carl Berst was the president and sole stockholder of Standard. William G. Hamilton was plant manager of Standard's plastics division, Eugene Palmbach was Standard's secretary-treasurer, and Armand Cimaroli was Standard's manufacturer's representative.

Plaintiff's articles of incorporation authorized one class of stock denominated as common stock, $10 per share par value. Originally the articles authorized 1000 shares of said stock. Effective January 23, 1962, the articles were amended to increase the authorized shares to 20,000 shares common stock, $10 par value. At all times relevant hereto there was no other class or series of stock authorized by the articles.

The shareholders of the plaintiff and the number of shares held by each shareholder during the years 1957 through 1964 were as follows:

| Shareholder | May 31, 1958 | May 31, 1959 | May 31, 1960 | May 31, 1961 | May 31, 1962 | May 31, 1963 | May 31, 1964 |
|---|---|---|---|---|---|---|---|
| William G. Hamilton | 800 | 800 | 700 | 700 | 2800 | 2800 | 2800 |
| Ann Hamilton Kirk | 100 | 100 | 100 | 100 | 400 | 400 | 400 |
| Eugene Palmbach | 100 | 100 | 100 | 100 | 400 | 400 | 400 |
| William Hamilton, Jr. | 0 | 0 | 100 | 100 | 400 | 400 | 400 |
| Armand Cimaroli | 0 | 0 | 0 | 0 | 400 | 400 | 400 |
| Elizabeth G. Berst | 0 | 0 | 0 | 0 | 0 | 0 | 245 |
| Sara Garnett | 0 | 0 | 0 | 0 | 0 | 0 | 245 |

The directors of plaintiff from June 1, 1957, through June 4, 1961, were William G. Hamilton, Ann Hamilton Kirk, and Eugene Palmbach. As of June 4, 1961, Armand Cimaroli succeeded Ann Hamilton Kirk.

William G. Hamilton is the son of Elizabeth G. Berst, the stepson of Carl Berst, the brother of Ann Hamilton Kirk, and the father of William Hamilton, Jr. Sara Garnett is the sister of Elizabeth G. Berst.

On or about June 1, 1957, certain instruments were issued to Elizabeth G. Berst and Sara Garnett in consideration for advances to plaintiff in the amount of $12,500 each. Elizabeth G. Berst advanced $8,500 on June 1, 1957; $2,000 on August 27, 1957; and $2,000 on December 16, 1957. Sara Garnett advanced $5,000 on June 1, 1957, and $7,500 on December 4, 1957. An additional $187.-50 was included by Sara Garnett with the December 4, 1957 advance as interest. This amount was returned to her.

In each of the instruments issued to Elizabeth G. Berst and Sara Garnett it was provided that plaintiff promised to pay $12,500; that the amount was payable at Portage, Wisconsin, on June 1, 1962; and that plaintiff would pay interest in the amount of 5 percent of its net profits before taxes. These provisions were set forth on standard note forms.

At the time of the issuance of the instruments a verbal agreement was entered into by the parties to the effect that at the end of the five years either Elizabeth G. Berst or Sara Garnett, or both, could renew the June 1, 1957 instrument at her own request for an additional five years. On June 1, 1962, the two instruments were renewed pursuant

to said agreement for an additional five years by the issuance of similar instruments. The plaintiff had no right unilaterally to renew the instruments.

There was no provision in the instruments, nor was there any collateral written or verbal understanding between the parties, for the repayment of the amounts advanced in the event of default on payment of interest. The plaintiff established no sinking fund or other similar provision to retire the obligations within the time periods provided.

In June, 1959, Elizabeth G. Berst and Sara Garnett executed separate written agreements subordinating all their rights under the June 1, 1957 instruments in favor of the City Bank of Portage, Wisconsin, for one year in exchange for the bank's granting plaintiff an open line of credit in the amount of $25,000. On February 8, 1962, Elizabeth G. Berst executed a written agreement subordinating all of her rights under the June 1, 1957 instrument in favor of loans from the First National Bank of Chicago to plaintiff. On March 26, 1962, Sara Garnett executed a written agreement subordinating all of her rights under the June 1, 1957 instrument in favor of loans from the First National Bank of Chicago to plaintiff.

The instruments were recorded as notes payable on the books and records of the corporation and were shown as long term debt and as notes payable on the annual audit reports prepared by certified public accountants and on financial statements furnished to banks and other creditors. The accrual and payment of the amounts characterized as "interest" in the instruments were recorded on the books and records of the corporation in the accrued interest payable account.

Elizabeth G. Berst and Sara Garnett each received the following sums in the following years, and these payments were characterized as "interest": 1959, $957.87; 1960, $4,916.05; 1961, $4,737.31; 1962, $3,323.79; and 1963, $2,245.03.

In June, 1963, Elizabeth G. Berst and Sara Garnett exchanged the June 1, 1962 renewal instruments for 245 shares each of the common stock of plaintiff.

Plaintiff obtained and maintained a life insurance policy on the life of William G. Hamilton in the face amount of $50,000. The original beneficiaries were Elizabeth G. Berst (¼ interest), Sara Garnett (¼ interest), and the Appleton Corporation (½ interest). The Appleton Corporation was owned by Elizabeth G. Berst (10%) and the Appleton Trust (90%). The beneficiaries of the Appleton Trust were Elizabeth G. Berst, William G. Hamilton, Ann Hamilton Kirk, and Elizabeth Siegel, Mr. Berst's sister. The application of insurance which originally gave plaintiff no right to change the beneficiary was amended to reserve the right to plaintiff. Effective December 1, 1960, the Appleton Corporation was removed as a beneficiary of said policy and the interest of Elizabeth G. Berst and Sara Garnett was limited to $12,500 each. Effective December 5, 1963, plaintiff was made the sole beneficiary of said policy.

The balance sheets with respect to plaintiff's operations from its inception through its fiscal year ended May 31, 1964, reflect the following pertinent information:

|  | Total Assets | Current Liabilities | Long-Term Liabilities | Capital Stock | Undistributed Earnings | Net Profits |
|---|---|---|---|---|---|---|
| May 31, 1958 | 120,948.83 | 124,433.91 |  | 10,000 | (13,485.08) | (13,485.08) |
| May 31, 1959 | 159,848.61 | 147,549.28 |  | 10,000 | 2,299.33 | 15,888.55 |
| May 31, 1960 | 321,707.07 | 178,423.42 | 80,195.10 | 10,000 | 53,088.55 | 44,692.15 |
| May 31, 1961 | 398,633.56 | 182,297.78 | 76,934.17 | 10,000 | 129,401.61 | 76,313.06 |
| May 31, 1962 | 572,515.77 | 268,493.02 | 137,203.47 | 44,000 | 122,819.28 | 64,389.99 |
| May 31, 1963 | 694,745.73 | 361,178.77 | 162,898.02 | 44,000 | 126,668.94 | 46,555.71 |
| May 31, 1964 | 713,973.00 | 364,394.56 | 87,037.95 | 69,000 | 193,540.49 | 67,496.88 |

During the period August 31, 1957, to October 20, 1959, plaintiff borrowed a total of $42,000 from the Appleton Corporation. The maximum amount outstanding at any time was $23,500. No notes were issued in exchange for these advances nor was interest paid. During the period October 21, 1957, to March 17, 1959, plaintiff borrowed $62,200 from the Berst Corporation, of which Carl Berst was the major shareholder. The maximum amount outstanding at any time was $16,100.

Plaintiff's ratio of debt to equity was comparatively high at all times during the period in question. This may be explained in part by the fact that the business was more successful than anticipated, and there was an increasing need for capital to meet the demands of rapid expansion.

Plaintiff made no distributions with respect to its common stock during fiscal years 1958 through 1961. Cash distributions were made to common shareholders in the aggregate amount of $40,000 for the fiscal year 1962 and $36,000 for the fiscal year 1963. A primary reason for these distributions was to provide funds for the shareholders to meet their tax obligations.

Plaintiff made timely elections under Section 1372(a) not to be subject to corporate income taxes for its fiscal years 1961, 1962 and 1963.

The issue for determination is whether plaintiff qualified as a small business corporation within the meaning of Section 1371(a) so as to be eligible to elect under Section 1372(a) not to be subject to corporate income taxes for its fiscal years 1961, 1962 and 1963. Section 1371(a) provides:

"(a) Small business corporation.— For purposes of this subchapter, the term 'small business corporation' means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—

"(1) have more than 10 shareholders;

"(2) have as a shareholder a person (other than an estate) who is not an individual;

"(3) have a nonresident alien as a shareholder; and

"(4) have more than one class of stock."

It is not disputed that plaintiff met all of the requirements for qualification as a "small business corporation" within the meaning of Section 1371(a) for its fiscal years 1961, 1962, and 1963 except the last, that it not have more than one class of stock. Defendant contends that the instruments issued to Elizabeth G. Berst and Sara Garnett in exchange for the advances of $12,500 from each were contributions to the capital of plaintiff rather than loans, and constituted a class of stock within the meaning of Section 1371(a) (4). Plaintiff denies that the advances were contributions to the capital of plaintiff rather than loans, but contends that whether the advances are characterized as contributions to capital or as loans, they did not constitute a class of stock within the meaning of Section 1371(a) (4). It does not appear to be disputed that if the advances are held to be a class of stock within the meaning of Section 1371(a) (4), the class is different from the class of authorized common stock.

Although plaintiff contends that the issue whether the advances are to be characterized as contributions to capital or as loans is irrelevant to the issue whether the instruments given in exchange for the advances constituted a class of stock under Section 1371(a) (4), the courts have considered the former issue in Section 1371(a) (4) cases.

Whether advances to a corporation constitute contributions to capital or constitute loans is said to be essentially a question of fact. Gilbert v. Commissioner of Internal Revenue, 262 F.2d 512, 513 (2d Cir.), cert. den. 359 U.S. 1002, 79 S.Ct. 1139, 3 L.Ed.2d 1030 (1959); Matthiessen v. Commissioner of Internal Revenue, 194 F.2d 659, 661 (2d Cir. 1952). The burden is upon the tax-

payer to establish that the advances constitute loans. Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, 350 F.2d 225, 228 (7th Cir. 1965); Arlington Park Jockey Club, Inc. v. Sauber, 262 F.2d 902, 905 (7th Cir. 1959); *Gilbert, supra; Matthiessen, supra.*

Of all the factors to be considered, the most persuasive in the present case is that the interest to be paid was a percentage of net profits. In Commissioner of Internal Revenue v. Meridian & Thirteenth R. Co., 132 F.2d 182, 186 (7th Cir. 1942), it was stated that:

> "the essential difference between a creditor and a stockholder is that the latter intends to make an investment and take the risks of the venture, while the former seeks a definite obligation, payable in any event."

Fixing the rate of interest at a percentage of net profits is a clear indication that, with respect to being rewarded for the use of their money, Elizabeth G. Berst and Sara Garnett intended to take the risks of the venture as opposed to accepting a fixed reward payable in any event.

Plaintiff has cited many cases to support the view that an advance may establish a debtor-creditor relationship despite the fact that interest is contingent on net profits. All are distinguishable.

In John Kelley Co. v. Commissioner of Internal Revenue, 326 U.S. 521, 530, 66 S.Ct. 299, 90 L.Ed. 278 (1946); Commissioner of Internal Revenue v. H. P. Hood & Sons, Inc., 141 F.2d 467 (1st Cir. 1944); Washmont Corp. v. Hendrickson, 137 F.2d 306 (9th Cir. 1943); American Bemberg Corp. v. United States, 150 F. Supp. 355 (D.Del.1957) aff'd 253 F.2d 691 (3d Cir.) cert. denied 358 U.S. 827, 79 S.Ct. 45, 3 L.Ed.2d 67 (1958); Lansing Community Hotel Corp. v. Commissioner of Internal Revenue, 14 T.C. 183 (1950), aff'd per curiam 187 F.2d 487 (6th Cir. 1951); and Pierce Estates, Inc. v. Commissioner of Internal Revenue, 16 T.C. 1020 (1951) rev'd on other grds. 195 F.2d 475 (3d Cir. 1952), interest was payable out of net profits but the rate of interest was fixed as a percentage of the principal. In Dorzback v. Collison, 195 F.2d 69 (3d Cir. 1952), and Erwin de Reitzes-Marienwert v. Commissioner of Internal Revenue, 21 T.C. 846 (1954), payments which were based on a percentage of net profits were held to be deductible as interest. However, in each case the payments were made to one who could have been considered a partner of, or joint venturer with, the taxpayer; whether or not the payments were characterized as interest, the effect on revenue would have been non-existent or insignificant. In Kena, Inc. v. Commissioner of Internal Revenue, 44 B.T.A. 217 (1941), the issue was whether the amount paid to petitioner, measured by a percentage of the profits earned by a certain individual, constituted interest within the meaning of Section 351(b) (1) of the Revenue Act of 1934 for the purpose of determining whether petitioner was a personal holding company; whether the amount received by petitioner had been characterized as interest or as a dividend would not have affected whether petitioner was to be characterized as a personal holding company under the statute involved. In Mayer v. Commissioner, 13 T.C.M. 391 (1954), the issue was whether petitioner was a partner in the operation of a business, so that in the absence of adequate records, a share of the partnership profits was attributable to her for income tax purposes. Petitioner had paid certain sums to the partnership, but contended these were loans and as such had been repaid. The Commissioner contended they were capital contributions. The evidence established that petitioner had not, in good faith and with a business purpose, intended to be a partner, and petitioner was found not to be a partner.

Other factors which are indicative that the advances here constituted contributions to capital rather than loans are: on two different occasions the rights which Elizabeth G. Berst and Sara Gar-

nett enjoyed under the instruments were subordinated to certain bank loans, Charter Wire, Inc. v. United States, 309 F.2d 878, 881 (7th Cir. 1962), cert. denied 372 U.S. 965, 83 S.Ct. 1090, 10 L.Ed. 2d 129 (1963); plaintiff had a comparatively high ratio of debt to equity, John Kelley Co. v. Commissioner of Internal Revenue, *supra* at 526 of 326 U.S., 66 S.Ct. 299, Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, *supra* at 228 of 350 F.2d; there was no provision for acceleration of payment of principal in case of default in interest payments, cf. O. H. Kruse Grain & Milling v. Commissioner of Internal Revenue, 279 F.2d 123, 125 (9th Cir. 1960), Kolkey v. Commissioner of Internal Revenue, 27 T.C. 37, 59 (1956), aff'd 254 F.2d 51 (7th Cir. 1958); and the plastics business of Standard had been a marginal operation, thereby rendering plaintiff's anticipated returns speculative in nature, Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, *supra* at 229 of 350 F.2d, Arlington Park Jockey Club v. Sauber, *supra* at 905 of 262 F.2d.

Plaintiff relies on the following factors: (1) the instruments in question provided a fixed date for payment; (2) interest was determinable by a fixed formula rather than at the discretion of plaintiff; (3) the instrument holders enjoyed no voting rights nor did they participate in management; (4) the instrument holders were not shareholders of plaintiff; (5) the instruments were standard printed note forms; and (6) the instrument holders enjoyed priority over the claims of shareholders.

With respect to the assertions that the documents were standard printed note forms and provided a fixed date for payment, the court is "not precluded by the form of the certificates from inquiring into the real substance of the transactions", Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, *supra* at 228 of 350 F.2d. "[E]ven in form the certificates do not meet the classic criteria of a bona fide debt set out in Gilbert v. Commissioner of Internal Revenue, 248 F.2d 399 (2d Cir. 1957)", Sherwood Memorial Gardens, Inc. v. Commissioner of Internal Revenue, *supra* at 228:

"The classic debt is an unqualified obligation to pay a sum certain at a reasonably close fixed maturity date along with a fixed percentage in interest payable regardless of the debtor's income or lack thereof." 248 F.2d at 402.

With respect to the assertions that the instrument holders enjoyed no voting rights, did not participate in management, and enjoyed priority over shareholders, such qualities may be characteristic of preferred stockholders.

The factors which support the view that the advances in question constituted contributions to capital of plaintiff clearly outweigh those which support the view that the advances constituted loans. I find and conclude that they constituted contributions to capital.

It remains to be determined whether this conclusion requires the further conclusion that the instruments given in exchange for the advances constituted a second class of stock within the meaning of Section 1371(a) (4).

Plaintiff asserts that it does not. The government asserts that it does, relying on Treas.Reg. § 1.1371–1(g) (as amended, 1966) T.D. 6904, 1967–1 Cum.Bull. 219, which provides in pertinent part:

"Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock."

The government notes that the disputed instruments in the present case were not held solely by the owners of the nominal

stock. The government also relies on Henderson v. United States, 245 F. Supp. 782 (M.D.Ala.1965), and Catalina Homes, Inc. v. Commissioner, 23 T.C.M. 1361 (1964), in which it was held that purported debt obligations which were held solely by those who owned or controlled the nominal stock of the corporation in substantially the same proportion as their ownership or control constituted a class of stock within the meaning of Section 1371(a) (4). Both of these cases were decided before Treas.Reg. § 1.1371–1(g) was amended to its present form. Prior to the amendment Treas. Reg. § 1.1371–1(g) provided in pertinent part: "If an instrument purporting to be a debt obligation is actually stock, it will constitute a second class of stock."

Plaintiff relies on Gamman v. Commissioner, 46 T.C. 1 (1966), Lewis Building & Supplies, Inc. v. Commissioner, 25 T.C.M. 844 (1966), and Brennan v. O'Donnell, 68–1 U.S.T.C. par. 9314 (N.D. Ala.1968), which held that although purported debt obligations which were held solely by owners of the nominal stock of a corporation represented contributions to capital, they did not constitute a class of stock within the meaning of Section 1371(a) (4). In *Gamman* and *Lewis* the purported debt obligations were held in substantially the same proportion as the holders' ownership in the respective corporation. In *Brennan* the purported debt obligations were not held in proportion to ownership.

All of the cases relied upon by the parties are distinguishable from the present situation since in each of those cases the purported debt obligations were held solely by owners of the corporation. All except Brennan v. O'Donnell, *supra*, fall directly within the exception to the general rule set forth in Treas. Reg. § 1.1371–1(g). The question is, therefore, presented whether the rule set forth in Treas.Reg. § 1.1371–1(g), that obligations which represent equity capital will generally constitute a second class of stock, unless said obligations are owned solely by the owners of the nominal stock in substantially the same proportion as they own such nominal stock, should control the outcome here.

Initially, it should be noted that the court in Brennan v. O'Donnell, *supra,* refused to adhere strictly to Treas.Reg. § 1.1371–1(g) since the purported debt obligations involved in that case were not held in substantially the same proportion as the nominal stock.

The legislative history of the "Subchapter S" provisions (Sections 1371–1378) provides some assistance to the present inquiry. The purpose of these provisions in general appears to have been to permit small businesses to select a form of organization without the necessity of taking into account major differences in tax consequences. S.Rep. 1983, 85th Cong. 2d Sess. 1958, United States Code Congressional and Administrative News, Vol. 3, pp. 4791, 4876; McGaffey, The Requirement That a Subchapter S Corporation May Have Only One Class of Stock, 50 Marq.L.Rev. 365 (1966) (hereinafter cited as McGaffey).

With respect to the purpose of the one class of stock requirement, there is little in the legislative history during 1958, the year of enactment of Subchapter S, to indicate the reason for this requirement. In 1954, however, the Senate had considered the predecessor provisions of Subchapter S under which small corporations would have been taxed as partnerships. Although the treatment of small corporations proposed at that time was somewhat different from that under the Subchapter S provisions, the proposed legislation in 1954 did include a requirement that an eligible corporation have only one class of stock. See McGaffey, *supra* at 367. The Senate Committee report indicates that the purpose of the requirement was to avoid the administrative complexities which would arise in general in the allocation of earnings or losses among several classes of stock, and in particular in allocation when there was a payment of dividends on preferred stock in excess of earnings.

S.Rep.No.1622, 83d Cong. 2d Sess. 119, 453–454 (1954). Further support for the proposition that the purpose of the one class of stock requirement was to prevent administrative complexities that might be encountered in the absence of such a requirement is provided by the Senate Committee report in 1964 when amendments were made to the Subchapter S provisions. S.Rep.No.830, 88th Cong. 2d Sess. 146 (1964); see generally McCaffey, *supra* at 367–368.

Another conceivable purpose of the one class of stock requirement arises from

the intention of Congress to make the Subchapter S provisions available to small corporations, essentially comparable to partnerships and proprietorships. Gamman v. Commissioner, *supra* at 7 of 46 T.C.

It does not appear that the traditional debt-equity tests applied in other areas of tax litigation are relevant to the general purpose of Subchapter S or to the two conceivable purposes of the one class of stock requirement described above. See Gamman v. Commissioner, *supra* at 12.[1]

1. Relying on the language in Gamman v. Commissioner, *supra* at 12, the government contends that the traditional debt-equity tests are applicable to the determination whether a corporation has more than one class of stock within the meaning of Section 1371(a) (4) in a situation in which the corporation has accumulated earnings and profits from a period prior to electing Subchapter S status. The government notes that in the present case plaintiff did have accumulated earnings and profits from the period prior to its election of Subchapter S status.

To understand this contention, it is necessary to consider a practice frequently utilized in non-Subchapter S situations to avoid taxation on repayment of advances, and to consider the effect which Subchapter S status has on the necessity for this practice.

When advances are made to a non-Subchapter S corporation, a common practice is to cast the advance as a loan rather than a contribution to capital. One reason for this practice is that a loan can be repaid on a tax-free basis to the creditor whereas repayment of an advance which represents equity may, under certain circumstances, be taxable as a dividend at ordinary income rates.

This reason for such a practice disappears in the situation in which a shareholder makes advances to a Subchapter S corporation which has no accumulated earnings and profits from a period prior to election of Subchapter S status. This results from the fact that a prerequisite to the characterization of such a repayment as a dividend is that proportional payments will have been made to the other shareholders; the fact that the payment of dividends reduces the "undistributed taxable income" of the corporation, section 1377(a); and the fact that each shareholder must include in his gross

income his pro rata share of the "undistributed taxable income" of the corporation.

Assume X corporation with A, B, and C as equal shareholders. Assume further that A, B, and C have each advanced $1000 to X. Assume further that in a given year X has $600 of taxable income and distributes $100 each to A, B, and C. Consider first the situation in which X is a non-Subchapter S corporation. X will be taxed on $600. If the distribution of $100 each to A, B, and C is considered to represent a dividend, A, B, and C will each be taxed on the $100 which each receives at ordinary income rates. If, on the other hand, the distribution of $100 each to A, B, and C is considered to represent repayment of the principal of a loan, A, B, and C will not be taxed on the $100 which each receives. Consider now the situation in which X is a Subchapter S corporation. X will not be taxed on the $600. If the distribution of $100 each to A, B, and C is considered to represent a dividend, A, B, and C will each be taxed on the $100 which each receives at ordinary income rates and in addition A, B, and C will each be taxed at ordinary income rates on $100 which is the pro rata share of A, B, and C of the "undistributed taxable income" of X which is $300. If, on the other hand, the distribution of $100 each to A, B, and C is considered to represent repayment of a loan there is no tax on the receipt of the $100 each, but each will be taxed at ordinary income rates on $200 which is the pro rata share of the "undistributed taxable income" of X which is $600. In either case in the Subchapter S situation A, B, and C are each taxed at ordinary income rates on $200.

If a Subchapter S corporation has accumulated earnings and profits from a

It must be determined whether a conclusion that the instruments given in exchange for the advances constitute a second class of stock would serve the purposes of Subchapter S in general and the one class of stock requirement in particular.

It is clear that plaintiff during the period in question was a small corporation, of the type that the Subchapter S provisions were intended to benefit.

The government asserts, however, that the other purpose of the one class of stock requirement, namely, avoidance of administrative complexities, would be served by a conclusion that the instruments given in exchange for advances constituted a second class of stock. It does not appear, however, that the administrative complexities which were sought to be avoided by the one class of stock requirement would be created by a conclusion that the instruments here did not constitute a second class of stock. No problem of allocation of earnings and losses between various classes of stock arises in the present situation unless the instruments are first determined to represent a class of stock.

Nor is there present here the problem of allocation which would arise in the situation in which there is a distribution of dividends in excess of earnings to preferred stockholders. Under § 1373

(b) a shareholder of an electing small business corporation must include in his gross income the amount which he would have received as a dividend if there were distributed pro rata to the stockholders at the end of the taxable year an amount equal to the corporation's undistributed taxable income for the year. "Undistributed taxable income" is defined by § 1373(c) as taxable income less the tax imposed by § 1378(a) and less the amount of money distributed as dividends during the taxable year. Where dividends in excess of earnings are distributed to the preferred stockholders, an inequity to the common stockholders results. The common stockholders have already been taxed on the amounts distributed to the preferred stockholders in excess of earnings, since these amounts represent undistributed taxable income of the corporation in prior years. However, the common stockholder can only receive a capital loss benefit for his part of the previously taxed income. Section 1376(a). Some sort of refund mechanism would, therefore, be necessary to prevent inequity to the common stockholder in such circumstances. No such problem arises in the situation in which the "interest" on the advances is to be paid only out of net profits before taxes. Where the "interest" payments are made in the year in which they accrue, the only difficulty presented is one

---

period prior to election of Subchapter S status, however, the reason for the practice described above does not completely disappear. This results from the fact that accumulated earnings and profits from a period prior to election of Subchapter S status are not taxable to the shareholders pro rata. Therefore, a distribution out of earnings and profits accumulated from a period prior to election of Subchapter S status does not reduce the amount otherwise taxable to the shareholders pro rata.

Since plaintiff had accumulated earnings from a period prior to its election of Subchapter S status, the government contends that Elizabeth G. Berst and Sara Garnett each had a tax motive for casting the advances in question as loans rather than contributions to capital.

In the present case, however, neither Elizabeth G. Berst nor Sara Garnett attempted to gain a tax-free redemption of the advances. They turned in the instruments given in exchange for the advances and they received in exchange stock in plaintiff corporation. Moreover, even if Elizabeth G. Berst and Sara Garnett had attempted to achieve a tax-free redemption of the advances, the dispute would not be one which directly involved the tax liability of plaintiff. In such a situation presumably the debt-equity tests would be applicable to determine whether the advances should be characterized as loans or contributions to capital for the purpose of preventing Elizabeth G. Berst and Sara Garnett from gaining an unintended tax advantage.

of characterizing the "interest" payments. Whatever the characterization, however, no administrative problem is presented. If the "interest" payments are characterized as interest, the amount of the interest is not part of the taxable income of the corporation. If, on the other hand, the "interest" payments are characterized as dividends, the amount of the dividends is not part of the "undistributed taxable income" of the corporation within the meaning of § 1373 (b).

█ It appears from the foregoing discussion that the general purpose of Subchapter S to permit small businesses to select a form of organization without regard to tax consequences would be served by a conclusion that plaintiff was eligible to elect to be taxed as a small business corporation during the years in question. It further appears that the purposes of the one class of stock requirement, to avoid administrative complexities and to limit the advantages of Subchapter S status to small corporations, would not be served by a conclusion that the instruments in question constituted a second class of stock within the meaning of § 1371(a) (4). Accordingly, I conclude that the instruments issued to Elizabeth G. Berst and Sara Garnett in exchange for the advances by them to plaintiff did not constitute a class of stock within the meaning of Section 1371(a) (4). Therefore, I conclude that plaintiff qualified as a small business corporation within the meaning of Section 1371(a) so as to be eligible to elect under Section 1372(a) not to be subject to corporate income taxes for its fiscal years 1961, 1962 and 1963.

The government's motion to dismiss under Rule 41(b) is hereby denied.

It is hereby ordered that judgment be entered for plaintiff on its claims for a refund of the amounts paid as income taxes for its fiscal years 1961, 1962 and 1963, together with interest assessed and paid thereon and statutory interest.