PARKER OIL COMPANY, INC., PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4907–69.   Filed September 21, 1972.

*Henry B. Steagall II*, for the petitioner.
*Henry C. Stockell, Jr.*, and *J. Leon Fetezer*, for the respondent.

GOFFE, *Judge*: Respondent determined a deficiency in petitioner's Federal income tax for the taxable year ending June 30, 1967, in the amount of $56,985.10.

The sole issue for decision is whether the election of Parker Oil Co. to be taxed as a small business corporation under the provisions of section 1372(e)(3)[1] terminated in 1966 for failure to comply with the requirement of section 1371(a)(4) that the corporation have only one class of stock.

This will require us to decide whether 5 shares of stock of the petitioner covered by an agreement among the stockholders and the corporation which provided for an irrevocable proxy, for disproportionate voting for the election of directors, and for disproportionate voting

---

[1] All statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

by the directors, constitutes a second class of stock thereby terminating petitioner's election to be taxed under the provisions of subchapter S.

### FINDING OF FACTS

All of the facts have been stipulated. The stipulation of facts and the exhibits attached thereto are incorporated herein and adopted as our findings.

Parker Oil Co., Inc. (sometimes hereinafter referred to as Parker Oil), is a corporation organized under the laws of Alabama. For all times material herein the joint venture of Fuel Services, Inc., and Parker Oil engaged in the business of refueling aircraft under a contract with the U.S. Government. At the time of filing its petition herein, the principal place of business of Parker Oil was Ozark, Ala. In reporting its income Parker Oil utilized a fiscal year which ended on June 30 and for the taxable year ended June 30, 1967, it filed a U.S. small business corporation return with the district director of internal revenue, Birmingham, Ala. A valid election to be taxed as a small business corporation pursuant to section 1372 had been filed by Parker Oil on June 1, 1959.

At the time of incorporation 100 shares of stock were issued as follows:

|  | Shares |
| --- | --- |
| Wilmer Parker | 40 |
| Annie Laura Parker (wife of Wilmer Parker) | 10 |
| Don W. Parker | 50 |

The total number of shares issued represented a single class of voting common stock.

On May 24, 1961, Don W. Parker signed an instrument which purported to "sell, assign and transfer" to Annie Laura Parker 5 shares of the 50 shares owned by him. The instrument appointed Wilmer Parker, president of Parker Oil, as agent to transfer the 5 shares of stock on the books of the corporation to Annie Laura Parker. The transfer of the 5 shares adjusted the stock ownership of the outstanding shares as follows:

|  | Shares |
| --- | --- |
| Wilmer Parker | 40 |
| Annie Laura Parker | 15 |
| Don W. Parker | 45 |

On October 4, 1966, Don W. Parker sued Wilmer Parker, Annie Laura Parker, Henry B. Steagall II (an officer of the corporation but not a shareholder), and Parker Oil in the Circuit Court of Coffee County, Ala., Enterprise Division in Equity, seeking, among other relief, to have the 5 shares of stock previously transferred to Annie Laura Parker transferred back to him.

Such litigation was settled by the parties and embodied in a written

agreement dated December 30, 1966, which provided (insofar as material herein) as follows:

1. Conveyance of 5 shares of the stock of Parker Oil from Annie Laura Parker to Don W. Parker;

2. Execution by Don W. Parker of an irrevocable proxy covering 5 shares of stock naming M. N. Brown and Ben B. Henderson, jointly or the survivor of them, as the holders of the proxy. It granted to Brown and Henderson the power to vote the 5 shares at any meeting of the stockholders of Parker Oil from the date of the settlement agreement until final dissolution of Parker Oil. The right to vote granted by the proxy was as complete as the power would be in Don W. Parker if present to vote but could be exercised only upon the joint concurrence of Brown and Henderson. By a later agreement of the parties, Henderson was dropped from the proxy and M. N. Brown became the sole holder of the proxy. The stock certificate for the 5 shares transferred from Annie Laura Parker to Don W. Parker was to bear a legend that such shares were subject to the irrevocable proxy to Henderson and Brown. This legend was for the purpose of making the proxy apply to anyone who might own the 5 shares after Don W. Parker.

3. The directors elected were Wilmer Parker, Annie Laura Parker, Don W. Parker, Ben B. Henderson, and M. N. Brown. Henderson and Brown were given collectively one vote as a director if concurred in by both, and the remaining three votes or directors were given one each to directors selected by Wilmer Parker, Annie Laura Parker, and Don W. Parker, four votes being the maximum permitted so long as Parker Oil remained in corporate existence. Three votes were to constitute a quorum and a majority of those voting was required for corporate action. The voting power of Wilmer Parker, Annie Laura Parker, and Don W. Parker in the selection of directors was binding upon their successors in interest.

4. No officers' salaries were to be paid by Parker Oil after the date of the settlement agreement and only routine daily activities of the business of the corporation were to be conducted thereafter; matters such as execution of contracts and loans were to require approval of the board of directors. All parties agreed to use their best efforts to continue in effect the contract of the U.S. Government with petitioner and Fuel Services, Inc., as joint venturers. Upon termination of the contract, Parker Oil was to be dissolved and liquidated unless the board of directors unanimously voted to extend the corporate existence for 1 year following termination of the contract.

The settlement agreement was carried out by the parties, i.e., Annie Laura Parker conveyed 5 shares to Don W. Parker; Don W. Parker

executed the irrevocable proxy covering the 5 shares in favor of M. N. Brown and Ben B. Henderson and the stock certificate for the 5 shares covered by the proxy bore the legend that the shares were subject to the settlement agreement.

The settlement agreement did not provide for amendment to the articles of incorporation to reflect any portions of the settlement agreement. The articles of incorporation provide that there shall be only one class of stock.

After giving effect to the agreement the outstanding shares of Parker Oil were owned as they were at the time of incorporation, i.e.—

| | Shares |
|---|---|
| Wilmer Parker | 40 |
| Annie Laura Parker | 10 |
| Don W. Parker | 50 |

The *voting power as stockholders* of the corporation, after giving effect to the agreement (as amended to delete Ben. B. Henderson as a party), was as follows:

| | Votes |
|---|---|
| Wilma Parker | 40 |
| Annie Laura Parker | 10 |
| Don W. Parker | 45 |
| M. N. Brown | 5 |

The *voting power of the directors*, giving effect to their method of selection as provided in the agreement, was as follows:

| | Votes |
|---|---|
| Wilmer Parker's and Annie Laura Parker's directors | 2 |
| Don W. Parker's director | 1 |
| M. N. Brown's director | 1 |

The respondent, in his statutory notice of deficiency, determined that petitioner ceased to be a small business corporation as defined in section 1371(a) during the taxable year ended June 30, 1967, because it had more than one class of stock and its election to be taxed under the provisions of section 1372(a) was terminated by reason of the operation of section 1372(e)(3)(B).

### OPINION

The sole issue to be decided is whether petitioner ceased to be taxable under the provisions of subchapter S of the Internal Revenue Code by reason of creation of a second class of stock. Section 1371 of the Code defines a corporation which may elect to have its income taxed to its shareholders under the provisions of subchapter S as a "small business corporation." One requirement under the definition is that the corporation have only one class of stock (sec. 1371(a)(4)). If the corporation ceases to come within the definition of section 1371, its election to be

taxed under the provisions of subchapter S terminates for the taxable year during which the corporation ceased to fall within the requirements of the definition of "small business corporation" (sec. 1372(e)(3)).

Respondent contends that Parker Oil ceased to be a "small business corporation" for the taxable year ended June 30, 1967, because during that taxable year it had more than one class of stock. No such second class of stock was created by the articles of incorporation such as was the case in *Pollack* v. *Commissioner*, 392 F. 2d 409 (C.A.5, 1968), affirming 47 T.C. 92 (1966). Nor does this issue turn on whether debt of the corporation is in substance equity such as was involved in *W. C. Gamman*, 46 T.C. 1 (1966). The instant case instead is one of substance versus form, the respondent contending that the settlement agreement and irrevocable proxy granted by Don W. Parker in substance created a second class of stock. In form there can be no second class of stock because it is expressly forbidden by the terms of the articles of incorporation.

Respondent relies upon section 1.1371–1(g), Income Tax Regs., upon Rev. Rul. 63–226, 1963–2 C.B. 341, and upon the *Pollack* case.

Section 1.1371–1(g), Income Tax Regs., provides in part:

(g) *Classes of stock.* A corporation having more than one class of stock does not qualify as a small business corporation. * * * If the outstanding shares of stock of the corporation are not identical with respect to the rights and interest which they convey in the control, profits, and assets of the corporation, then the corporation is considered to have more than one class of stock. Thus, a difference as to voting rights, dividend rights, or liquidation preferences of outstanding stock will disqualify a corporation. However, if two or more groups of shares are identical in every respect except that each group has the right to elect members of the board of directors in a number proportionate to the number of shares in each group, they are considered one class of stock. Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock.

Rev. Rul. 63–226, 1963–2 C.B. 341, holds in part:

Furthermore, in the event that the outstanding stock of a corporation is subject to any other type of voting control device or arrangement, such as a pooling or voting agreement or a charter provision granting certain shares a veto power or the like, which has the effect of modifying the voting rights of part of the stock so that particular shares possess disproportionate voting power as compared to the dividend rights or liquidation rights of those shares and as compared to the voting, dividend and liquidation rights of the other shares of stock of the corporation outstanding, the corporation will be deemed to have more than one class of stock. Accordingly, the corporation does not qualify as a small business corporation.

The portions of the regulations and revenue ruling quoted above are apparently based upon the legislative history reflecting congressional intent in the enactment of subchapter S. We have had occasion

to express our views on such congressional intent in other opinions. See *W. C. Gamman, supra* at 7–8, 13, and *James L. Stinnett, Jr.*, 54 T.C. 221, 230–232, 235–236 (1970), on appeal (C.A. 9, Sept. 23, 1970). No useful purpose could be served by repeating such analysis here.

Our views on the congressional intent as to the second class of stock requirement in the definition of a subchapter S corporation is shared by other courts. See *A. & N. Furniture & Appliance Co.* v. *United States*, 271 F. Supp. 40 (S.D. Ohio 1967), and *Portage Plastics Co.* v. *United States*, 301 F. Supp. 684 (W.D. Wis. 1969), reversed on other grounds 470 F. 2d 308 (C.A. 1972). Suffice it to say, we feel there is no congressional intent to deprive the taxpayer of subchapter S benefits under the facts of the instant case. We conclude that the overriding purpose of the requirement that only one class of stock exist in a corporation qualifying under subchapter S is to avoid complexities in taxing income to shareholders with different preferences as to the distribution of profits.

The all-inclusive language of the regulations and revenue ruling quoted above is too broad in light of the congressional intent. When such language is applied to the facts in this case, we believe the intent of Congress is being thwarted. The alteration of voting power brought about by the settlement agreement among Parker Oil and its stockholders and the irrevocable proxy could not conceivably alter the reporting of the relative shares of the profits of the corporation by its stockholders. It created no complication as to the reporting of income by the stockholders. The shifting of voting power for 5 shares from Don W. Parker to M. N. Brown could not affect the distribution of earnings in any manner.

The provisions of subchapter S were devised for small businesses. Many such corporations are family owned and differences of opinion as to management policies sometimes develop. Settlement of such differences can often be resolved by agreement of the shareholders. We conclude that is what happened here. Surely such a practical solution to discord within the corporation should not result in termination of subchapter S status by reason of a technical interpretation of the one class of stock provision where there is no reason for imposing a prohibition on the bare shift of voting power. We, therefore, hold that under such circumstances section 1.1371–1(g), Income Tax Regs., and Rev. Rul. 63–226, *supra*, are invalid to the extent that they hold a second class of stock is created unless all of the shares outstanding are identical as to all voting rights.

A proxy is a widely used corporate tool. It has a very practical purpose even in a small, closely held corporation. Under the law of Alabama (the State of incorporation and principal place of business

of petitioner) voting is permitted by proxy. See Ala. Code tit. 10, sec. 21 (53) (Supp. 1969). Petitioner argues that the Alabama law does not permit a proxy to be irrevocable. We find it unnecessary in deciding this case to interpret the Alabama law because we conclude that no second class of stock was created regardless of the irrevocability of the proxy.

Respondent relies upon the *Pollack* case. *Pollack* is distinguishable. It is an extreme case where an amendment to the articles of incorporation prior to the issuance of any stock established four classes of stock which set up voting power not proportionate to the number of shares in each class. The purpose of creating such classes was found to be occasioned by equal investment of capital by the organizers of the corporation but unequal ownership of shares. In that case there was in form more than one class of stock. The opinion was based upon the fact that the stockholders created more than one class of stock in the amended articles of incorporation thus coming within the specific terms of the statute and petitioners therein apparently did not argue that the treasury regulations failed to reflect congressional intent.

We conclude, therefore, that no second class of stock was created during petitioner's taxable year ended June 30, 1967.

Reviewed by the Court.

*Decision will be entered for the petitioner.*

---

FEATHERSTON, *J.*, concurring: I agree with the Court's conclusion that the settlement and proxy agreements of December 30, 1966, as amended, did not cause a termination of Parker Oil's subchapter S election. I also agree that Rev. Rul. 63-226, 1963-2 C.B. 341, goes beyond the statute, but I think these results can be reached without declaring section 1.1371-1(g), Income Tax Regs., invalid in any respect. Rather, I think the regulation should be so interpreted as not to apply to the facts of this case.

The provision in section 1371(a)(4), limiting subchapter S eligibility to corporations not having "more than one class of stock," in my view, is addressed to the nature and character of the stock as such. The same is true with respect to section 1.1371-1(g) of the regulations which states that "a difference as to voting rights * * * will disqualify a corporation." Notwithstanding Rev. Rul. 63-226, I do not think either of these provisions refers to a proxy, an agreement whereby a shareholder authorizes someone else to vote his stock. See Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, ch. 6, p. 7 (3d ed. 1971). Such an agreement does not affect the voting rights conferred by the stock; it merely specifies who will exercise those rights.

In the instant case, the certificate of incorporation expressly provides that "There shall be but one class of stock." Neither the December 30, 1966, settlement agreement nor the proxy agreement purports to alter this provision. Indeed, as I read the applicable Alabama statute (Ala. Code tit. 10, sec. 21(32) (Supp. 1969)) neither instrument could have done so; that statute contemplates that the voting rights of stock are to be defined in the certificate of incorporation and contains no suggestion that they may be defined in any other way.

Insofar as here pertinent, the settlement and proxy agreements, as amended by the agreement of March 2, 1967, merely authorized M. N. Brown to vote the 5 shares which Annie Laura Parker conveyed to Don W. Parker in settlement of the dispute. It is true that the proxy was described as irrevocable and was endorsed on the stock certificate, but that endorsement did not affect the nature and character of the voting rights conferred by the stock—it merely designated a person to exercise those rights. It is also true that the corporation was nominally a party to the settlement agreement, but that agreement called for no formal corporate action with respect to the voting rights of the 5 shares. It was an agreement between the shareholders as such. Significantly, when the proxy agreement was modified on March 2, 1967, to eliminate Henderson's proxy rights, the corporation was not even a party to the amendment, and the amendment was not endorsed on the certificate. This suggests that the proxy was irrevocable only in the sense that it was to remain in effect as long as the shareholders as such so agreed. Moreover, under the settlement agreement, the 50 shares of stock owned by Wilmer and Annie Laura Parker were to elect two directors and the other 50 shares were to elect two directors; the only effect of the settlement agreement, signed by all the shareholders, in this respect was to designate M. N. Brown as one of the directors to be elected by Don W. Parker's 50 shares. I do not think these facts fall within either the statute or the regulation here in controversy.

In applying the regulation on voting rights, it is important that eligibility for subchapter S treatment is limited to closely held corporations, i.e., corporations with 10 or less shareholders. In a real sense, closely held corporations are "essentially partnerships." As between themselves, their stockholders frequently operate the corporate business as if they were partners, working out various kinds of arrangements for managing corporate affairs. These arrangements may include, for example, agreements providing that each shareholder will vote for the other as a director, or that each will have a veto power as to the election of directors, or that shares of two or more share-

holders will be pooled or voted together. These agreements are particularly useful in situations like the one in the instant case where misunderstandings which have arisen between the shareholders can be resolved only by advance arrangements as to how the directors are to be selected and how the stock will be voted.

State laws have recognized the need for special arrangements between the shareholders of closely held corporations.[1] The New York statute, for example, provides that shareholders may agree in writing that "in exercising any voting rights, the shares held by them shall be voted as therein provided, or as they may agree, or as determined in accordance with a procedure agreed upon by them." N.Y. Bus. Corp. sec. 620(a) (1963). I see no reason why such practical arrangements between shareholders should disqualify a corporation for subchapter S treatment. See Note, "Stockholder Agreements and Subchapter S Corporations," 19 Tax L. Rev. 398 (1964).

As pointed out by the Court, the only real justification for the "one class of stock" requirement of section 1371(a)(4) is to facilitate the pass-through of dividends and liquidating distributions. None of the legislative materials that I have found gives any substantive clue as to why the voting rights provision was incorporated in the regulation or how differences in voting rights would complicate the administration of subchapter S. In these circumstances, I think the regulation should be narrowly construed.

I would limit the applicability of the regulation to situations where the differences in voting rights are defined in the manner prescribed by the applicable State law; this is all the court did in *Pollack* v. *Commissioner*, 392 F. 2d 409 (C.A. 5, 1968). I do not think the disputed regulation applies to a proxy agreement even though it is intended to remain in effect until the shareholders change their minds.

DRENNEN, DAWSON, TANNENWALD, and QUEALY, *JJ*., agree with this concurring opinion.

RAUM, *J*., dissenting: This case is not fairly distinguishable from *Samuel Pollack*, 47 T.C. 92, which was affirmed by the Fifth Circuit, 392 F. 2d 409. This case, too, arises in the Fifth Circuit. There, as here, there was involved the application of Income Tax Regs. section 1.1371–1(g), which implements and construes the statutory provision that a subchapter S corporation may not have more than one class of stock, and which provides that "a difference as to voting rights * * * will disqualify a corporation." In *Pollack*, the only difference

---

[1] N.Y. Bus. Corp. sec. 620(a) (1963) ; Conn. Gen. Stat. Ann. sec. 33–339 (1958) ; S.C. Code Ann. sec. 12–16.15 (Supp. 1971) ; Tex. Bus. Corp. Act art. 2.30 B (Supp. 1972) ; Model Business Corporation Act Ann. 2d sec. 34 (1971).

in voting rights related to the weight to be given the shares in the election of directors; in all other respects, both as to voting generally and in every other manner, the various shares were identical. Indeed, even the limited restriction with respect to the election of directors did not appear on the certificates, nor were such certificates otherwise identified as being of different "classes," although the shares were described as being of different classes in the amended articles of association.

In the present case, the restriction relating to the voting of the 5 shares in question was of a more drastic character than in *Pollack*. Here, the owner of these shares was irrevocably deprived of the right to vote his shares in any manner, a legend setting forth that disability appeared on the certificate of stock itself, and any purchaser or transferee of those shares could acquire them only subject to that restriction. The situation is entirely different from an ordinary proxy; here, the shares themselves were burdened with a permanent disability that persisted throughout their existence, regardless of who any subsequent owner might be. These 5 shares were certainly different in respect of voting rights from the remaining shares of the corporation. While it is true they were not described as being of a different class, the label should be a matter of no consequence. Cf. *Portage Plastics Co.* v. *United States*, 370 F. 2d 308 (C.A. 7), reversing 301 F. Supp. 684, where an equity interest in a corporation was held to represent a different class of stock, notwithstanding that it wasn't even formally labeled as stock at all.

Even if the matter were in doubt, the applicable provisions of the regulations quoted above require that the shares in question be treated as being of a different class. The prevailing opinion cavalierly brushes these regulations aside by treating them as invalid, contrary to the well-established principle that "Treasury regulations must be sustained unless unreasonable and plainly inconsistent with the revenue statutes and that they constitute contemporaneous constructions by those charged with the administration of these statutes which should not be overruled except for weighty reasons." *Commissioner* v. *South Texas Co.*, 333 U.S. 496, 501. See also *Bingler* v. *Johnson*, 394 U.S. 741, 749–750; *Fawcus Machine Co.* v. *United States*, 282 U.S. 375, 378; *Boske* v. *Comingore*, 177 U.S. 459, 470; *Brewster* v. *Gage*, 280 U.S. 327, 336; *Textile Mills Corp.* v. *Commissioner*, 314 U.S. 326, 336–339; *Colgate Co.* v. *United States*, 320 U.S. 422, 426. This rule is fully recognized and followed in the Fifth Circuit. See, e.g., *Group Life & Health Insurance Co.* v. *United States*, 434 F. 2d 115, 120; *Miami Beach First National Bank* v. *United States*, 443 F. 2d 116, 120. Moreover, the very regulations here in question were applied both by this

Court and the Fifth Circuit in *Pollack*. I can find no warrant in the language of the statute or its legislative history [1] for dealing a lethal blow to these regulations. I would sustain the Commissioner's determination.

SIMPSON and STERRETT, *JJ.*, agree with this dissent.

---

STERRETT, *J.*, dissenting: I have already indicated my agreement with the view set forth in Judge Raum's cogent dissent, but I would like to add the following comments of my own.

Section 1371(a)(4) explicitly limits the benefits of subchapter S to those corporations which do not "have more than one class of stock." The thrust of the majority's opinion seems to be, as indicated for example by the basis upon which it distinguishes the instant case from *Pollack* v. *Commissioner*, 392 F. 2d 409 (C.A. 5, 1968), that the pivotal factor in its conclusion is the fact that the action in issue was taken by the shareholders as differentiated from action by the corporation. Such a conclusion will no doubt now be cited as a precedent for permitting shareholders to do indirectly what they cannot do directly. Through the simple expedient of making a unanimous irrevocable agreement among themselves, the shareholders [1] can affix the rights of a stock issue as effectively as can be done by official corporate action. We have present here a case where 5 shares of stock were stripped permanently of their voting rights. These 5 shares have something less than the other 95 outstanding shares. From a substantive point of view they can reasonably be analogized to an issue of nonvoting common.

Further, if the shareholders may privately rearrange voting rights, what is to prevent them from rearranging the interests in the assets upon liquidation or providing for the payment of some prescribed amount to one particular shareholder, or group of shareholders, to the exclusion of others? Such an arrangement could easily be required as an inducement to secure the participation of some particularly valuable individual. Would not such an arrangement as readily thwart the

[1] Indeed, the legislative history is at best murky. In S. Rept. No. 1622, 83d Cong., 2d Sess. (1954), the Senate Finance Committee commented upon similar statutory provisions for the 1954 Code which were not then adopted, saying (p. 453):

No class of stock may be preferred over another as to either dividends, distributions, *or voting rights*. If this requirement were not made, undistributed current earnings could not be taxed to the shareholders without great complications. * * * [Emphasis supplied.]

While the second sentence may be a non sequitur from that portion of the first sentence relating to voting rights, it nevertheless appears that the Committee did regard a difference in voting rights as a basis for classifying stock differently. From petitioner's point of view, the most that can be said of the legislative history is that it is inconclusive, but it is in precisely such circumstances that an applicable regulation should be sustained.

[1] Under sec. 1371(a)(1) this number can never exceed 10.

purpose of Congress, as found by the majority, "to avoid complexities in taxing income to shareholders with different preferences as to the distribution of profits" as would the direct issuance of differing stock interests by the corporation? The answer must be in the affirmative.

If obeisance to the idiom "hard cases make bad law" is necessary, so be it, but let us not add to the cases which caused its birth.

SIMPSON, *J.*, agrees with this dissent.