**PORTAGE PLASTICS COMPANY, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

**No. 71-1555.**

United States Court of Appeals,
Seventh Circuit.

Heard En Banc Dec. 13, 1972.

Decided March 2, 1973.

---

John O. Olson, U. S. Atty., Madison, Wis., Fred B. Ugast, Acting Asst. Atty. Gen., Thomas L. Stapleton, Atty., Department of Justice, Tax Division, Washington, D. C., for defendant-appellant.

James Urdan, Milwaukee, Wis., for plaintiff-appellee.

Before SWYGERT, Chief Judge, and KILEY, FAIRCHILD, CUMMINGS, PELL, STEVENS and SPRECHER, Circuit Judges.

CUMMINGS, Circuit Judge.

This appeal presents the question whether plaintiff qualified as a small business corporation within the meaning of Section 1371(a) of the Internal Revenue Code, thus supporting its timely elections under Section 1372(a) not to be subject to corporate income taxes for the fiscal years 1961, 1962 and 1963.[1] The district court upheld plaintiff's qualification (301 F.Supp. 684), but a panel of this Court reversed by divided vote (470 F.2d 308). On *en banc* consideration, we now affirm the district court's refund judgment.

The facts were largely stipulated, but other facts were found after a bench trial. There is no dispute as to the facts, and only the essential ones reflected in the testimony or found by the district court will be stated in this opinion.

Plaintiff, a plastics manufacturer, is a Wisconsin corporation with its principal place of business in Portage, Wisconsin. It adopted the accrual method of accounting, with its fiscal years ending May 31. It was organized on June 1, 1957, and its Articles of Incorporation authorized 1,000 shares of common stock with a par value of $10 per share. Effective January 23, 1962, the Articles were amended to increase the authorized shares to 20,000 shares of common stock of the same par value. No other class of common stock was authorized.

During the first of the fiscal years in question, plaintiff's stockholders were William G. Hamilton, Ann Hamilton Kirk, Eugene Palmbach and William Hamilton, Jr., and in the latter two fis-

1. See 26 U.S.C. §§ 1371(a) and 1372(a).

cal years, Armand Cimaroli was an additional stockholder.

According to the testimony of the secretary-treasurer of plaintiff, its organizers "did not want to sacrifice any of the equity of the corporation" to obtain working capital but found a very unfavorable reception from banks in regard to loans. As a result, on June 1, 1957, William G. Hamilton's mother, Mrs. Elizabeth Berst, and his aunt, Miss Sara Garnett, agreed to advance the plaintiff $12,500 each and in exchange received standard business note forms. These instruments obligated plaintiff to pay Mrs. Berst and Miss Garnett $12,500 apiece on June 1, 1962, in Portage, Wisconsin, and contained the following provision for "Interest: 5% of the net profit before taxes." At the time of issuance, the parties verbally agreed that on June 1, 1962, either or both of the ladies could renew the June 1, 1957, instruments at their request for a similar 5-year period. Both ladies exercised their renewal options, and accordingly, on June 1, 1962, two identical renewal instruments were executed. In June of 1963, Mrs. Berst and Miss Garnett exchanged those instruments for 245 shares each of common stock of plaintiff.

There was no oral or written agreement for the repayment of the $25,000 advanced by the ladies in the event of default in payment of the stipulated "interest." Plaintiff did not establish a sinking fund to provide for the retirement of the obligations within the time periods provided.

Mrs. Berst and Miss Garnett executed separate agreements in June 1959, subordinating for a year all their rights pertaining to the instruments in favor of the City Bank of Portage, Wisconsin, a lender to plaintiff. On February 8 and March 26, 1962, respectively, they agreed to subordinate their rights in the instruments in favor of the First National Bank of Chicago, another lender to plaintiff.

The original and renewal instruments were recorded as Notes Payable on the books and records of the corporation and were shown as Long-term Debt and as Notes Payable on the annual audit reports prepared by its certified public accountants and on financial statements furnished to banks and other creditors. The accrual and payment of the amounts denoted as "interest" in the instruments were recorded on the books and records of the corporation in the Accrued Interest Payable account. The payments to each lady were as follows: $957.87 in 1959; $4,916.05 in 1960; $4,737.31 in 1961; $3,323.79 in 1962; and $2,245.03 in 1963. These payments reflected the unexpectedly fast growth of the corporation.

In the first year of operation, plaintiff lost $13,485.08, but thereafter earned substantial sums in each fiscal year. During the years in question, plaintiff had a relatively high debt to equity ratio because it found it necessary to borrow funds to fulfill the increasing needs for capital engendered by rapid expansion. No actual distributions were made with respect to the common stock until fiscal year 1962, when $40,000 was distributed, and in fiscal year 1963, when $36,000 was distributed. The primary reason for such distributions was to enable the shareholders to meet their tax obligations brought about as a result of plaintiff's timely election to be taxed pursuant to the provisions of Subchapter S of the Internal Revenue Code for the fiscal years ending in 1961, 1962 and 1963.

The Commissioner of Internal Revenue determined that plaintiff was ineligible to make the statutory election not to be subject to corporate income taxes for these three fiscal years on the ground that it had more than one class of stock and was therefore not a small business corporation as defined in Subchapter S. Accordingly, in January 1965, the Commissioner first notified plaintiff that he was claiming deficiencies in the amount of what he decided was the proper corporate income tax for the years 1961 through 1963. Plaintiff paid the deficiencies asserted and there-

after sued to recover income taxes and statutory interest in the amount of $164,733.13, plus interest. The district court held that plaintiff was entitled to such a refund because it "qualified as a small business corporation within the meaning of Section 1371(a) so as to be eligible to elect under Section 1372(a) not to be subject to corporate income taxes for its fiscal years 1961, 1962 and 1963." 301 F.Supp. at 694. We affirm.

Section 1371(a) of the Internal Revenue Code provides as follows:

> "*Small business corporation.*—For purposes of this subchapter, the term 'small business corporation' means a domestic corporation which is not a member of an affiliated group (as defined in section 1504) and which does not—
>
>  "(1) have more than 10 shareholders;
>
>  "(2) have as a shareholder a person (other than an estate) who is not an individual;
>
>  "(3) have a nonresident alien as a shareholder; and
>
>  "(4) have more than one class of stock."

(26 U.S.C. § 1371(a))

It is conceded that plaintiff met the first three requirements of the statute, but the Commissioner contends that the instruments issued to Mrs. Berst and Miss Garnett in exchange for their advances of $12,500 apiece were contributions to plaintiff's capital rather than loans and constituted a second class of stock, thus disqualifying plaintiff as a small business corporation. On the other hand, plaintiff contends that the advances were loans, but in any event did not constitute another class of stock within the meaning of the statute.

Applying the traditional tests of the thin capitalization doctrine, the district court held that the advances in question constituted contributions to capital. The court was impressed by the fact that the rate of interest was fixed at a percentage of net profits, thus placing the risks of the venture upon Mrs. Berst and Miss Garnett. The court was also impressed by the following factors: on two occasions their rights under the instruments were subordinated to bank loans; plaintiff had a comparatively high ratio of debt to equity; there was no provision for acceleration of payment of principal in case of default in interest payments; and plaintiff's plastics business had been a marginal operation, rendering its anticipated returns speculative in nature. In the aggregate, these factors were found clearly to outweigh those suggesting that the advances constituted loans. The entire panel of this Court agreed with the district court's conclusion that the advances were contributions to capital rather than loans under the criteria of the thin capitalization doctrine, but that decision is unnecessary to review here. The point at issue is whether the criteria heretofore developed to determine the debt versus equity question in other contexts are determinative of the question whether another "class of stock" exists within the meaning of Section 1371(a)(4).

Both in the district court and here, the Government relied on Treasury Regulation § 1.1371–1(g), which provides in pertinent part:

> "Obligations which purport to represent debt but which actually represent equity capital will generally constitute a second class of stock. However, if such purported debt obligations are owned solely by the owners of the nominal stock of the corporation in substantially the same proportion as they own such nominal stock, such purported debt obligations will be treated as contributions to capital rather than a second class of stock." (T.D. 6904, 1967–1 Cum.Bull. 219)

The Government of course points to the inapplicability of the second sentence of the Regulation because Mrs. Berst and Miss Garnett were then not stockholders of the plaintiff corporation, so that the proportionality exception of the Regulation was inapplicable. It is the Government's position that the tests of the thin capitalization doctrine deter-

mine the existence of a second class of stock if the instruments in question do not come within the exception of the Regulation's second sentence. The underlying argument does little more than postulate the ubiquitous utility of those tests. Then the Government simply states: "Every instrument representing an advance to a corporation is either stock or debt. There is no such thing as non-stock equity. Corporate obligations that have been recharacterized as equity, are preferred stock for tax purposes."[2]

While holding that these advances constituted contributions to capital rather than loans, the district court concluded that "it does not appear that the traditional debt-equity tests applied in other areas of tax litigation are relevant to the general purpose of Subchapter S or to the two conceivable purposes of the one class of stock requirement * * *" (301 F.Supp. at 692). Consequently, the court analyzed the instruments in question in the light of the statutory purposes to ascertain whether they would be served by a conclusion that they constituted a second class of stock, disqualifying plaintiff from eligibility for Subchapter S status. The judge's perceptive analysis led him to conclude:

" * * * that the general purpose of Subchapter S to permit small businesses to select a form of organization without regard to tax consequences would be served by a conclusion that plaintiff was eligible to elect to be taxed as a small business corporation during the years in question. It further appears that the purposes of the one class of stock requirement, to avoid administrative complexities and to limit the advantages of Subchapter S status to small corporations, would not be served by a conclusion that the instruments in question constituted a second class of stock within the meaning of § 1371(a)(4)." (301 F.Supp. at 694)

In the panel's prior opinion herein, the majority was of the view that the criteria heretofore developed to determine the debt versus equity question under the thin capitalization doctrine and used by the district court to conclude that the advances by Mrs. Berst and Miss Garnett were contributions to capital rather than loans were determinative of the existence of a second class of stock. Thus the majority upheld the validity of Treasury Regulation § 1.1371–1(g) and held that thereunder, once the district court had concluded the advances were contributions to capital, that *ipso facto* meant they constituted a class of stock, the proportionality exception being inapplicable.

For the reasons detailed in the dissenting opinion (470 F.2d at 316), incorporated herein by reference, we conclude that the traditional thin capitalization doctrine tests for determining whether a purported loan should be treated as an equity contribution in order to prevent improper tax avoidance in

2. Principal appellate brief for the United States, p. 28 (footnote omitted).

Although Treasury Regulation § 1.1371–1(g) states that obligations actually representing equity capital will "generally" constitute a second class of stock, the Government has not argued that the regulation admits of any exception other than that set forth in its second sentence. On the contrary, as the Fifth Circuit also found in Amory Cotton Oil Co. v. United States, 468 F.2d 1046, 1054 (5th Cir. 1972), " * * * the construction advanced, in fact insisted upon, by the Commissioner is that the regulation is mandatory in operation unless the specific exception of proportionality is applicable." Accord: Shores Realty Co., Inc. v. United States, 468 F.2d 572, 576–578 (5th Cir. 1972).

The proportionality exception adds to, rather than detracts from, the regulation's arbitrariness since the fact that debt is held proportionately by the shareholders is a factor traditionally considered to militate in favor of recharacterization as equity. See, *e. g.*, Henderson v. United States, 245 F.Supp. 782 (M.D.Ala.1965); Cataline Homes, Inc., 23 CCH Tax Ct. Mem. 1361, 1367 (1964); Caplin, The Caloric Count of a Thin Incorporation, 43 Marq.L.Rev. 31, 57, 69 (1959).

other contexts are not suitable for determining whether a purported loan constitutes a second class of stock within the meaning of Section 1371(a)(4).[3] The Fifth Circuit has also recently so concluded in Shores Realty Co., Inc. v. United States, 468 F.2d 572 (1972); see Amory Cotton Oil Co. v. United States, 468 F.2d 1046 (5th Cir. 1972).

As can best be divined, the purpose of the single class of stock requirement was none other than to avoid the administrative complexity in the allocation of income which would result with more than one class of stock when preferred dividends were paid in excess of current earnings from undistributed but taxed prior earnings.[4] Because the shareholders of a Subchapter S corporation are pro rata taxed on the corporation's undistributed taxable income for any year, if in a subsequent year dividends in excess of current earnings are distributed to preferred shareholders, the common stockholders will have already been taxed on the excess going to the preferred shareholders. But under the existing provisions of the Code, the common shareholders could only receive a capital loss benefit for the previously taxed income which they did not receive. Section 1376(a). Consequently, some sort of refund mechanism would be necessary to prevent the inequity to the common shareholders, and this is the administrative problem Congress evidently sought to avoid through the single class of stock requirement.

Although the district court accurately pointed out that this problem could not

occur in the instant case because "interest" on the advances was to be paid only out of net profits before taxes, it further appears that the problem is not encountered in any case so long as interest is treated as interest. This is because shareholders are permitted a deduction for the excess of interest payments over earnings in any year, and hence they are adequately compensated for having been previously taxed on the earnings out of which interest payments may later be made.[5] 26 U.S.C. § 1374(a), (d)(1); see 26 U.S.C. § 1376(b). Indeed, assuming that the general problem of allocation of earnings and losses between various classes of stock was a Congressional concern in enacting the single class of stock requirement,[6] the district court recognized that the problem arises only if the interest payments are first recharacterized as dividends (301 F.Supp. at 693). The same principle applies to the particular administrative problem which occurs when dividends are paid to preferred shareholders in excess of current earnings—it is a problem only if the payments are recharacterized as dividends in the first place. The Government concedes as much when it states, *"Once the notes have been recharacterized as equity,* they present the same tax accounting problems with respect to the Subchapter S treatment of the corporation's undistributed taxable income and net operating loss as are presented by preferred stock." (Principal appellate brief for the United States, p. 13; emphasis supplied.)

3. As emphasized in the prior dissenting opinion, this conclusion in no way forecloses use of the thin capitalization doctrine tests to recharacterize purported debt as equity where appropriate to deny particular tax benefits wrongfully taken in those cases where tax avoidance through the use of debt is still available in the Subchapter S context and in those cases where it is peculiarly available within the confines of Subchapter S. 470 F.2d at 318 and n. 9.

4. S.Rep. No. 1622, 83d Cong., 2d Sess. 453–454 (1954).

5. Whatever problems that exist with "leakage" of previously taxed but undistributed earnings when a shareholder transfers stock before interest is paid out of them in a year giving rise to a net operating loss, these problems are inherent in the provisions of Subchapter S and exist regardless of the nature of the loan. See Note, 41 N.Y.U.L.Rev. 1012, 1018–1019 (1966); Note, 67 Colum.L.Rev. 494, 513–514 (1967).

6. See 470 F.2d at 320 n. 12.

The earlier dissenting opinion in this cause and the Fifth Circuit's opinion in *Shores Realty, supra,* have demonstrated that just because the purported loans come out on the capital contribution end on the thin capitalization test scale is not a sufficient reason to make that initial recharacterization. In enacting the single class of stock requirement, there is no evidence of a Congressional design to ensure that what is debt for corporate purposes be insulated from the risks of the business venture to such an extent that the doctrine's tests would not recharacterize it as equity if used for tax avoidance. And generally, in enacting Subchapter S, Congress has evinced no concern with the manner in which a small business corporation is capitalized in terms of how the contributors furnish money or property to the corporation. Quite the contrary, for the primary policy underlying the enactment of Subchapter S is "to permit businesses to select the form of business organization desired without the necessity of taking into account major differences in tax consequences."[7] Moreover, in seeking to approximate partnership tax treatment, it is difficult to understand why Congress would view differentiation among participants in the venture as to the form and extent of their participation as inherently bad from an economic policy standpoint.

The Government argues that if the taxpayer's denomination of the advances is to control, the corporation can avoid the single class of stock requirement by simply attaching a label of debt to any instruments different from the common stock of the corporation. But this argument is nothing else than a contention that a corporation should not be able to secure Subchapter S treatment through

a sham in a scheme of improper tax avoidance. Assuming the advantage of Subchapter S election itself can properly be considered improper tax avoidance,[8] this case hardly fits the Government's hypothetical. It does not exemplify an instance of masquerading instruments as debt in order to evade any qualification requirement for Subchapter S status. The capital structure of the plaintiff was established and its common stock and the instruments in question were issued in 1957 when Subchapter S did not exist.[9] Even considering Mrs. Berst and Miss Garnett as shareholders, plaintiff would have had no more than seven shareholders during any of the taxable years in question, would not have had a corporation, trust, or partnership as a shareholder, and would have had no alien shareholders. Section 1371(a)(1)–(3). The existence of a business purpose for the issuance of debt instruments to Mrs. Berst and Miss Garnett is not questioned. And, simply stated, the Commissioner has never contended that the capital structure of the plaintiff was adopted with a view toward taking advantage of Subchapter S by evading the requirements for qualification thereunder.

Furthermore, it ill suits the Government to argue that the tests of the thin capitalization doctrine are justified to prevent the above, hypothetical "evasion" because those tests were designed to prevent tax avoidance through the use of debt in contexts where treatment as debt would subvert underlying congressional policy to afford benefits for debt when "the funds were advanced with reasonable expectations of repayment regardless of the success of the venture * * * [and were not] placed at the risk of the business * * *." Gilbert

7. S.Rep. No. 1983, 85th Cong., 2d Sess. 87 (1958), U.S.Code Cong. & Admin.News 1958, p. 4791; see S.Rep. No. 830, 88th Cong., 2d Sess. 146 (1964), U.S.Code Cong. & Admin.News 1964, p. 1313.

8. For the argument *contra,* see Bravenec, The One Class of Stock Requirement of

Subchapter S—A Round Peg in a Pentagonal Hole, 6 Houston L.Rev. 215, 260–261 (1958); Note, 41 N.Y.U.L.Rev. 1012, 1017 (1966).

9. The Subchapter S provisions were enacted in 1958 as part of The Technical Amendments Act of 1958.

v. Commissioner, 248 F.2d 399, 406 (2d Cir. 1957) ; see Commissioner v. Meridian & Thirteenth R. Co., 132 F.2d 182, 186, 188 n. 7 (7th Cir. 1942). The Government does not have a comparable economic policy underlying its desire to thwart supposed spurious labeling through use of the thin capitalization doctrine tests. Apparently the Government is concerned solely with a nefarious tax avoidance motive in denominating certain advances as debt, but if that is a justifiable concern, it would seem only logical to attack the problem directly, instead of through the blunderbuss application of the thin capitalization doctrine tests. Moreover, it seems that Treasury Regulation § 1.1371–1(g) cannot be justified on the Government's argument, since that Regulation would apparently allow a corporation seeking to qualify for or retain Subchapter S status deliberately to put a label of debt on instruments that otherwise would have been denominated preferred stock in order to evade the single class of stock requirement—so long as the purported debt obligations were held by the shareholders in substantially the same proportion that they owned the nominal stock.

Finally, it is unnecessary to decide whether the advances in question were properly recharacterized as equity contributions under the tests of the thin capitalization doctrine, for in determining whether the instruments held by these ladies constituted a second class of stock, there is no occasion to utilize those tests. Even if they constituted contributions to capital according to those criteria, the Commissioner has not persuaded us that they must be considered as a second class of stock within the meaning of the statute. To the extent that Treasury Regulation 1.1371–1(g) calls for a contrary result, it is arbitrary and beyond the power of the Commissioner.[10]

Affirmed.

10. See note 2, *supra*.