869 F.2d 1491
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Michael G. JOLIN and Susan P. Jolin et al., Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 No. 85-1764.
 United States Court of Appeals, Sixth Circuit.
 March 17, 1989.
 
 Before NATHANIEL R. JONES, MILBURN and BOGGS, Circuit Judges.
 BOGGS, Circuit Judge.
 
 
 1
 In a consolidated case, respondent determined deficiencies in federal income tax for the 1978 calendar year against taxpayers Michael G. and Susan P. Jolin ("Jolins" or "Jolin") and Charles F. and Patricia G. Witte ("Wittes" or "Witte"). The Tax Court upheld the deficiencies on the grounds that the petitioners were shareholders in a corporation, Builder's Service Group of Ohio, Inc. (BSG Ohio), which was a general partner in certain limited partnerships for development and construction of real estate projects. Furthermore, the court held that various guaranteed payments and fees for services should have been included in the corporation's income for 1978 because all of the events had occurred to determine the liability for payment of the guaranteed payments to each of the limited partnerships by the end of the tax year. In addition, the corporation was determined to be a valid Subchapter S corporation during the tax years in question. This was so because Builder's Service Group of West Virginia (BSG W.Va.), a second corporation which reported its transactions as those of BSG Ohio, was determined not to be an affiliate of BSG Ohio. Thus, the two corporations were not entitled to file consolidated tax returns. Finally, the Tax Court held that the petitioners each owned one-half of BSG Ohio during the relevant time period.
 
 
 2
 We hold that the guaranteed payments should have been included in the general partner's income, and that there was a valid Subchapter S corporation in that the corporations were unaffiliated, and BSG Ohio issued only one class of stock. Further, we agree that Jolin and Witte each maintained a one-half ownership interest in BSG Ohio during the years in question. Thus, we affirm the Tax Court.
 
 
 3
 * Respondent determined deficiencies in federal income tax for the calendar year 1978 of $164,729.96 for Michael G. Jolin and Susan W. Jolin, husband and wife, and $151,615.52 for Charles Witte and Patricia G. Witte, also husband and wife. The deficiencies relate to a 50 percent interest that the Wittes and Jolins each held in Builder's Service Group of Ohio, Inc. a Subchapter S corporation. The taxpayers contested their ownership interests in BSG Ohio, as well as the Subchapter S status of the corporation and the corporation's status as general partner of a number of limited partnerships.
 
 
 4
 The principals in this dispute regarding the liabilities of the Jolins and Wittes for the tax year 1978 are the Jolins and Wittes themselves; Carl J. Monastra, a Certified Public Accountant; Earl B. Willhoit, a dentist and friend of Monastra; four limited partnerships named Madison, Ltd., Narrows Ltd., Romney Ltd., and Manitowoc Ltd.; two corporations, BSG Ohio and BSG W.Va.; and an investor group, Buckeye Investors, Ltd. The facts recited here are consistent with those reported in the Tax Court opinion.
 
 
 5
 Michael G. Jolin and Charles F. Witte formed BSG Ohio, an Ohio corporation, on September 30, 1976. BSG Ohio, through Jolin and Witte, engaged in the business of real estate development, including the construction of housing projects subsidized by the United States Government through Farmer's Home Administration (FmHA) under Section 515 of the Act authorizing loans by that agency; the United States Department of Housing and Urban Development under Section 8 of the Act authorizing loans by that agency; and with a view toward arranging Section 221(d)(4) loan guarantee programs also under the latter agency's programs. On September 30, 1976, BSG Ohio filed an election to be taxed under the provisions of Subchapter S of the Internal Revenue Code. It reported its income on a cash basis, and adopted a fiscal year ending June 30.
 
 
 6
 In 1976 and 1977, Jolin and Witte formed and syndicated the four previously mentioned limited partnerships for real estate development. Jolin and Witte issued prospectuses describing the proposed real estate projects, the sources of financing from construction and mortgage loans, and various guaranteed payments for organizational fees and services to the general partner. The dates that these partnerships were formed, their purpose, and the names of their shareholders and other relevant information taken from the prospectuses are contained in the following table:
 
 
 7
 * * *
 * * *Name of Place where Source # of When
Partner- Apartments of apt. formed
ship were to be financing units
 built
Madison, Ltd. Madison, Va FmHa 24 12/17/76
Romney, Ltd. Romney, W.Va. FmHa 36 12/76
Manitowoc, Ltd. Manit'c, Wisc. HUD Secs. 8 & 221 48 1/15/77
Narrows, Ltd. Narrows, W.Va. FmHa 32 12/15/77
Price of Names of Amount invested Documents
units/min. Investors and date Filed
units
$1,000/$10,000 Marvin Bryant; $10,000 Amended
(Madison) James and Limited
 Audra Partnership
 Black; $20,000 Agreement
 Daniel 5/26/77
 S. Grayson; $20,000
 James
 McElroy; $20,000
 James E.
 Kempe. $50,000
$1,000/$22,500 Carl J. Limited
(Romney) Monastra; $11,250 Partnership
 Vincent M. Certificate
 Panichi; $11,250 9/1/77
 Frederick T. Hampshire
 Forster; $22,500 County,
 Phillip G. W.Va.
 Fankhauser; $22,500
 James J.
 Hamman; $22,500
 James A.
 McElroy. $22,500
$1,000/$22,500 James V. $278,400 Amended
(Matinowoc) Farina. Limited
 Partnership
 Certificate
 12/30/77
 Fairfield
 County,
 Ohio
$1,000/$34,800 Anthony J. Amended
(Narrows) Disanto; $20,000 Limited
 James P. Partnership
 Whitney; $40,000 Certific-
 ate
 Gene & Leontina 12/30/77
 Fatica; $20,000 Fairfield
 Robert A. County,
 Zenobi; $60,000 Ohio
 Earl B.
 Willhoit. $20,000
 
 
 8
 * * *
 
 
 9
 * * *
 
 
 10
 The parties stipulated that each partnership used the accrual accounting method. Further, each limited partnership reported its income on a calendar year basis.
 
 
 11
 The projects proceeded in five stages: site selection, pre-application, development of the application, approval of the application and construction. Although all of the projects proceeded to the pre-application stage, only one, Madison, was ever completed. BSG Ohio was the contractor for each project. BSG Ohio, Jolin and Witte, and another corporation that they formed, BSG W.Va., were the organizers of each limited partnership, with various guaranteed payments and organizational expenses and fees payable to them singly or in combination, as described in the limited partnership agreements and prospectuses.
 
 
 12
 Each prospectus provided that the general partner would receive 75% of the cash flow and 5% of the profits on each project, cash flow being defined as "profits and capital contributions less reserves for contingencies." The prospectus permitted an unspecified portion of the guaranteed payments to be considered equity and some to be considered cash. The prospectuses further provided that syndication funds would be held in escrow pending completion of the projects. Advances of construction loans to the general partners were specifically made subject to construction progress. The prospectuses provided that deficiencies in construction loans would be financed personally by Jolin, Witte and the general partners, on an "arms length" basis.[1]
 
 
 13
 The total of guaranteed payments for all four projects was $628,900.00. In the Partnership Tax Returns for 1977 (Form 1065), Madison reported guaranteed payments of $102,000, of which $20,400 was deducted by the partnership. Romney reported guaranteed payments of $112,500, of which $22,500 was deducted. Manitowoc reported guaranteed payments of $278,400, of which $55,800 was deducted. Finally, Narrows reported guaranteed payments of $136,000, of which $27,200 was deducted. As best as can be ascertained, the general partners never received the guaranteed payments in 1978 except for a note of Madison's that BSG W.Va. discounted to Madison Equity Fund, an Ohio limited partnership, for $57,000, and the first installment of $27,840 of a $278,400 note from Manitowoc payable to BSG Ohio and Witte. The Jolins did not report any income or loss from BSG Ohio on their 1978 joint return. Jolin testified that this was because the escrow funds were never used to make guaranteed payments to the general partner. Furthermore, the prospectuses warned that the partnerships could not expect that the guaranteed payments would result in tax deductions to the partnership.
 
 
 14
 Jolin and Witte incorporated BSG W.Va. on April 27, 1977, in West Virginia. Although the Tax Court found that all of its activities were reported as transactions of BSG Ohio, part of this dispute concerns factual matters surrounding the separate activities of BSG W.Va.
 
 
 15
 Although the Tax Court held that BSG W.Va. was merely an agent of BSG Ohio, BSG W.Va. was identified as Romney's general partner on its form 1065 filed with the Internal Revenue Service in 1977. Furthermore BSG W.Va. assigned its purchase contract for the Romney site to Romney. BSG W.Va. was identified as the general partner of Madison in the prospectus and also in the Madison amended Limited Partnership Agreement. Madison Equity Fund's Form 3-Q filed with the Ohio Division of Securities stated that $57,000 was withdrawn by Charles Witte and BSG W.Va. The Narrows prospectus named BSG Ohio and Witte as general partners in some places and BSG Ohio as managing general partner. In other places, BSG W.Va. and Witte were the only general partners named. Witte was named a general partner along with BSG Ohio in Romney and in Madison. The Tax Court found that BSG W.Va. was not a general partner in Romney because the parties stipulated that BSG Ohio was the only general partner in Romney. Furthermore, because BSG W.Va.'s activities were reported as "transactions of BSG Ohio," the Tax Court found that BSG W.Va. was not the general partner of Madison, but, rather, was an agent of BSG Ohio. Instead, the Tax Court found that BSG was the only general partner of all of the limited partnerships and was entitled to the guaranteed payments from those partnerships.
 
 
 16
 In early 1977, Jolin contacted Carl J. Monastra, a Certified Public Accountant, in an effort to raise investment capital to cover anticipated overhead expenses during loan processing in connection with certain projects. Jolin proposed that Monastra and Earl B. Willhoit invest in 400 units at $400 per unit.
 
 
 17
 On or about May 21, 1977, a "Joint Venture Agreement" was entered into among Willhoit, Monastra, Jolin, Witte, and BSG Ohio. Under the terms of the document, the parties agreed among other things:
 
 
 18
 1. To fund Builder's Service Group of Ohio, Inc., a Subchapter S corporation, which would be funded at the rate of $10,000 per month, beginning on April 20, 1977.
 
 
 19
 2. That profits, of whatever source, would be divided three ways, according to 1/3 share ownership.
 
 
 20
 3. That Witte and Jolin would serve as individual general partners of BSG Ohio. Monastra and Willhoit would serve as limited partners, and, in addition, various corporate positions would be held by the parties to the agreement. Further, they would familiarize themselves with the arrangement and contribute their expertise and knowledge.
 
 
 21
 4. Transfer of shares on corporate records to accomplish share division would be completed promptly upon the signing of this agreement.
 
 
 22
 5. Projects in other states required separate corporations to satisfy lenders, and 1/3 shares would be established in those corporations as well as in Builders Service Group of Ohio, Inc. and would be transferred to Willhoit and Monastra.
 
 
 23
 The agreement further provided "that of the $160,000 committed, $80,000 will come out of the mortgage loans. They will be repaid at construction closings. The $160,000 figure is for cash flow assurances for sound operation."
 
 
 24
 Subsequent to the execution of the Joint Venture Agreement dated May 21, 1977, a document entitled "Amendment" was executed on about June 1, 1977, by Witte as chairman of the board of directors and by Jolin as president of BSG Ohio, which provided:
 
 
 25
 (As per Article 7, amendments By laws quota [sic] regulations of Builder's Service Group of Ohio, Inc., September 28, 1976.)
 
 
 26
 On this date, June 1, 1977, the Board of Directors agreed to transfer one third of the shares of Builder's Service Group of Ohio, Inc. to Mr. Earl Willhoit and Mr. Carl Monastra, thus giving each of the two men an undivided 1/2 interest in one-third of the shares of the corporation. Michael G. Jolin is to retain one-third of the shares of the corporation.
 
 
 27
 Personal financial statements purportedly prepared as of December 31, 1977, were signed by Jolin and Witte and indicated that each of them had a one-third interest in BSG Ohio.
 
 
 28
 At the trial, Witte testified that Jolin was bought out by Witte and Monastra pursuant to a Stock Redemption Agreement dated September 1978. The Tax Court found that there were no records to support the contention that Monastra and Willhoit controlled BSG Ohio; the only corroboration was the testimony of Karen Habersack, Jolin's employee.
 
 
 29
 On about March 12, 1979, Monastra and Willhoit acquired 100 percent of the equity in BSG Ohio and BSG W.Va. under an "Agreement, General Assignment and bill of Sale" dated March 1, 1979. The Agreement contained the following language:
 
 
 30
 Whereas, Jolin and Witte each owns one-third ( 1/3) of the equity, common stock or otherwise, in each of BSG-Ohio and BSG-W.Va.;
 
 
 31
 Whereas, Jolin and Witte hereby affirm their prior transfer of the remaining one-third ( 1/3) of such equity in each of BSG-Ohio and BSG-W.Va. to Monastra and Willhoit;
 
 
 32
 Whereas, Jolin and Witte have agreed to transfer all such remaining equity which they own in BSG-Ohio and BSG-W.Va. to Monastra and Willhoit....
 
 
 33
 Monastra and Willhoit raised the funds for the purchase under the previously executed Joint Venture Agreement by organizing a group of 10 investors, including themselves, known as "Buckeye Investors." Buckeye Investors advanced a total of $160,000 to BSG Ohio, at $10,000 for 16 months. The investment by Buckeye Investors carried no interest according to the agreement. Buckeye Investors received a one-third share in the profits after construction of 400 apartment units. According to Monastra's testimony, Buckeye Investors did not have any interest in BSG Ohio until 1979 when Monastra and Willhoit became shareholders. Jolin testified that after the transfer, he kept Manitowoc and sold Romney, Madison and Narrows to Willhoit and Monastra.
 
 
 34
 On its Form 1120-S, U.S. Small Business Corporation Income Tax Returns for 1977 and 1978 filed with the Internal Revenue Service, BSG Ohio reported that, at the end of each taxable year, it did not own, directly or indirectly, 50 percent or more of the voting stock of a domestic corporation, and that it was not a member of a controlled group subject to the provisions of section 1561.
 
 
 35
 By letter to the District Director, Cincinnati, Ohio, dated January 15, 1982, the Wittes objected to the adjustment resulting from respondent's examination and the audit changes previously accepted by Monastra. In that letter, under penalty of perjury, Charles Witte stated as follows:
 
 
 36
 During the year involved I, Charles F. Witte, owned 50% of the capital stock of the corporation. The tax return was prepared by the firm of Monastra Ciuni & Panichi, Certified Public Accountants. At the time of the audit, however, control of the corporation and its records had shifted to Carl Monastra of the accountant firm mentioned above. I feel that even though he signed the audit report, he had little interest in the outcome of the audit since it did not affect him. In other words, as owner of 50% of the corporation, I do not accept the examining officer's adjustment.
 
 
 37
 The partnerships paid to the corporation the amounts as reported in the tax return. There were no other payments on the installment notes involved and there never will be. It is my understanding that the partnerships involved have been dissolved.
 
 
 38
 The examining agent's report cites Sec. 707-C of the Code. Sec. 707-C of the Code clearly applies only to payments actually received. Since the corporation has not received the amounts in the examiner's adjustment, I do not owe any tax on it.
 
 
 39
 A partial trial was held on May 7, 9, and 11, 1984, in Columbus, Ohio. At the trial, the taxpayers made two arguments for nontaxability of the guaranteed payments: the effects of their accounting method as cash basis taxpayers on the accrual rule regarding guaranteed payments, and their reliance upon the regulations as requiring reporting only of monies actually received. The recorded transcript contains testimony relating to the lack of preparation on the accounting issue. The judge denied a motion to continue the trial for the purpose of preparing this issue. The petitioners filed a post-trial brief on November 1, 1984. The Tax Court's decision was entered on June 20, 1985. From these decisions, the taxpayers appeal to this court.
 
 II
 
 40
 Petitioners challenge the timing of the inclusion of the guaranteed payments in their income, and the attribution to them of payments made to the partnerships and the Subchapter S corporation. The petitioners failed to overcome the presumption of correctness of the deficiency notice in the Tax Court, which they could have done with a showing that the IRS made a "naked assessment without any foundation whatsoever." LaBow v. Commissioner, 763 F.2d 125, 132 (2d Cir.1985) (citation omitted). Therefore, we review all of the factual matters, including the issues of the partnership status of BSG Ohio and BSG W.Va., the Subchapter S status of the corporations, and the percentage of shares owned by the individual taxpayers during the relevant tax years according to the clearly erroneous standard. Roth Steel Tube v. Commissioner, 800 F.2d 625, 629 (6th Cir.1986). The issue of the timing of the inclusion of the guaranteed payments in the petitioners' income is a mixed question of law and fact that we review de novo. Ledbetter v. United States, 792 F.2d 1015, 1018 (11th Cir.1986).
 
 III
 
 41
 As the Tax Court stated in its opinion, the petitioners dispute the fairness of requiring cash basis partners, or general partners, to include in their income guaranteed payments that have been accrued as capital items by an accrual basis partnership when the partnership has received no reciprocal tax deduction. However, there is a statutory basis for the deficiency, and we can infer that Congress has considered the equities, and views them differently from the petitioners.
 
 
 42
 Internal Revenue Code Section 707(c) provides:
 
 
 43
 Guaranteed payments.--To the extent determined without regard to the income of the partnership, payments to a partner for services or the use of capital shall be considered as made to one who is not a member of the partnership, but only for the purposes of section 61(a) (relating to gross income), and, subject to section 263, for purposes of section 162(a) (relating to trade or business expenses).
 
 
 44
 26 U.S.C. 707(c) (1982 & Supp. III 1985). The Tax Court determined that this section applied to BSG Ohio because BSG Ohio was a general partner (had contributed services or the use of capital) of the limited partnerships. Since BSG Ohio was the general partner, any guaranteed payments to it were required under section 707(c) to be included as income on both its own 1978 tax returns and those of its stockholders. Thus, the first issue for review is whether the Tax Court was correct in holding that BSG was a general partner of the limited partnerships by the end of calendar year 1977.
 
 
 45
 * The inclusion of guaranteed payments in income on a tax return depends on the status of the taxpayer. In other words, if BSG Ohio was a general partner of all of the limited partnerships, then it was required to include as income on its 1978 return the full amount of guaranteed payments reported as expenses by the partnerships. The parties agree that BSG Ohio was the general partner of Manitowoc; however, the taxpayers dispute the Tax Court's finding that BSG Ohio was also a general partner of the other three partnerships. However, the parties have stipulated that BSG Ohio was a general partner in Romney during the taxable years 1977 and 1978. The taxpayers argue that BSG W.Va. was the general partner of Madison, Narrows and Romney, and that, therefore, the guaranteed payments with respect to those partnerships were not includable in BSG Ohio's income.
 
 
 46
 We agree with the Tax Court's analysis and conclusions. Although the evidence was somewhat equivocal, the documentary evidence establishes that BSG Ohio was a general partner in all three partnerships.
 
 
 47
 With respect to Narrows, the prospectus is inconsistent in designating a general partner. However, as the Tax Court noted, the amended limited partnership certificate as well as the subscription agreements and the 1977 and 1978 partnership information returns indicated that BSG Ohio was a general partner. Because those documents were drafted and filed later than the prospectus, those documents superseded the prospectus. Thus, BSG Ohio was a general partner of Narrows.
 
 
 48
 The documents submitted as evidence regarding Romney and Madison named BSG W.Va. as general partner. However, there was no evidence of any activities by BSG W.Va. as a general partner. Further, the parties stipulated that BSG Ohio was a general partner in Romney during the tax years in question. The parties also stipulated that BSG W.Va. operated as an affiliate of BSG Ohio, and that all transactions were reported as transactions of BSG Ohio for tax purposes. A schedule filed with the tax returns for Madison and Romney in 1977 used the tax identification number of BSG Ohio. Thus, all of the actions of the parties indicate that BSG Ohio was the general partner of Madison and Romney.
 
 B
 
 49
 Having found, as the Tax Court did, that BSG Ohio was the general partner of all four limited partnerships, we must now determine whether the full amount of the guaranteed payments reported by the limited partnerships in 1977 should have been included in BSG Ohio's income for the tax year ending on June 30, 1978. We agree with the Tax Court's determination that BSG Ohio should have reported the full amount of the guaranteed payments on its 1978 return.
 
 
 50
 First, we note that the petitioners do not dispute that the designated payments were guaranteed payments under section 707(c). In fact, the payments were designated as such in the prospectuses, briefs and stipulations.
 
 
 51
 The petitioners argue that Treasury Regulation Sec. 1.707-1(c) limits the inclusion of Sec. 707(c) guaranteed payments by cash basis partners to situations in which those payments are in fact deductible by the partnership. The timing of the inclusion of the payment as income to the partnership or the partner is addressed in Treas.Reg. 1.707-1(c):
 
 
 52
 Guaranteed payments. Payments made by a partnership to a partner for services or for the use of capital are considered as made to a person who is not a partner, to the extent such payments are determined without regard to the income of the partnership. However, a partner must include such payments as ordinary income for his taxable year within or with which ends the partnership taxable year in which the partnership deducted such payments as paid or accrued under its method of accounting. See section 706(a) and paragraph (a) of sec. 1.706-1.
 
 
 53
 Further, section 706(a) of the Internal Revenue Code provides:
 
 
 54
 (a) Year in Which Partnership Income is Includible.--In computing the taxable income of a partner for a taxable year, the inclusions required by section 702 and 707(c) with respect to a partnership shall be based on the income, gain, loss, deduction, or credit of the partnership for any taxable year of the partnership ending within or with the taxable year of the partner.
 
 
 55
 According to the Tax Court, the tax accounting method chosen by the taxpayer, as well as the choice to do business in partnership form, does not create a "loophole" which allows the partnership to defer inclusion of a guaranteed payment in a general partner's tax return. We agree. The partnerships used an accrual method of accounting. Under the accrual method, "an expense is deductible for the taxable year in which all events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Treas.Reg. Sec. 1.461-1(a)(2).
 
 
 56
 Fortunately, since the oral arguments in this case took place, the Supreme Court has provided us with guidance regarding the operation of the "all events" test. United States v. General Dynamics Corp., et al., --- U.S. ----, 107 S.Ct. 1732 (1987). A taxpayer may not deduct a contingent liability, nor may it "estimate an anticipated expense if it is based on events that have not occurred by the close of the taxable year." Id. at ----, 107 S.Ct. at 1736 (citations omitted).
 
 
 57
 In General Dynamics, the issue was "whether an accrual basis taxpayer providing medical benefits to its employees may deduct at the close of the taxable year an estimate of its obligation to pay for medical care obtained by employees ... during the final quarter of the year," which claims have not been reported to the employer at the time of the tax filing. Id. at ----, 107 S.Ct. at 1734. The Court reasoned that the final event necessary as a prerequisite to deductibility was the submission of the health benefits claim form. Id. at ----, 107 S.Ct. at 1736. "Mere receipt of services for which, in some instances, claims will not be submitted does not, in our judgment, constitute the last link in the chain of events creating liability for purposes of the 'all events' test." Id. at ----, 107 S.Ct. at 1737. Because General Dynamics had not shown that its liability was "firmly established" as of the end of the tax year, it was not permitted to claim a deduction. Id. at ----, 107 S.Ct. at 1738.
 
 
 58
 The obstacles to meeting the "all events" test in General Dynamics are not present in this case. As of December 31, 1977, all of the partnerships were fully syndicated and each limited partner had executed both a subscription agreement and a promissory note, and had paid the downpayment required under those documents. In fact, each partnership reported the full amount of the guaranteed payments and deducted 20 percent of those payments as current deductions on their 1977 Form 1065.
 
 
 59
 The petitioners claim that the actual payment of the guaranteed payments was contingent on the partnerships' ability to secure federal funding, which had not been secured by December 31, 1977. However, the prospectuses clearly stated that the guaranteed payments would be paid out of the contributions of the limited partners, not the federal funds. Further, the prospectuses stated that contributions by limited partners would be received by the partnerships before the completion of the projects. As we read the subscription agreements and promissory notes, as well as the Forms 1065 which were signed by Jolin himself, we can find no contingency which would have relieved a limited partner of the obligation to contribute to the partnerships, or which would have absolved the partnerships from making the guaranteed payments due to the general partner. Therefore, we must agree with the Tax Court's determination that BSG Ohio was required to include in income the full amount of the guaranteed payments due to it by the limited partnerships. This conclusion is consistent with the relevant Code sections as well as the Regulations, and is mandated by the Supreme Court's reasoning in General Dynamics. Thus, we affirm the Tax Court's holding on this issue.
 
 IV
 
 60
 We now turn to the remaining issues in this case: whether BSG Ohio was a small business within the meaning of Subchapter S; and the percentage of BSG Ohio stock owned by Jolin and Witte during the tax years in question.
 
 
 61
 * The law is clear that a Subchapter S corporation may not have more than one class of stock and may not be a member of an affiliated group of corporations as defined in Sec. 1504. I.R.C. Sec. 1371(a)(4). The question raised in this case is whether the stock purchase agreement executed in favor of Monastra and others constituted a second class of stock. Furthermore, we must consider whether BSG W.Va. was an affiliate of BSG Ohio within the meaning of Internal Revenue Code section 1504.
 
 
 62
 Petitioners contend that the investment by the Buckeye Investors constituted a second class of stock so as to terminate BSG Ohio's Subchapter S status. Treasury Regulation Sec. 1.1371-1(g) states that a second class of stock exists in a corporation if the outstanding shares are not identical with respect to the rights and interests they afford the stockholders in the "control, profits, and assets" of the corporation.
 
 
 63
 Monastra testified that there was no arrangement for a preference on the return of the Buckeye Investors' investment, and that none of the money was returned to the investors. Jolin testified that the Buckeye Investors were entitled to all profits up to $400 per unit on the first 400 units syndicated, and one-third of the profits on the 400 units thereafter. There was no evidence presented that any stock certificates or other instruments were issued to the Buckeye Investors, or that the alleged arrangement varied the rights, preferences or privileges of the original shareholders. There simply is no information in the record to support the petitioners' argument, or even to determine the precise nature of the interests, if any, acquired by the Buckeye Investors. Portage Plastics Co. v. United States, 486 F.2d 632 (7th Cir.1973). Thus, we must agree with the Tax Court's determination that, based on the record, we cannot conclude that BSG Ohio issued more than one class of stock.
 
 
 64
 We next turn to the petitioners' contention that BSG Ohio's consolidation of its income with BSG W.Va. for tax purposes made it a member of an affiliated group. An affiliated group is defined in Sec. 1504 of the Internal Revenue Code as a chain of corporations "connected through stock ownership with a parent corporation" and in which: (1) 80 percent of the voting stock of each corporation (other than the parent) is owned by one or more of the other includible corporations, and (2) with regard to at least one of the other includible corporations, "the common parent corporation owns at least 80 percent of the voting power of all classes of stock as well as 80 percent of the nonvoting stock."
 
 
 65
 Under Sec. 1501, only members of an affiliated group of corporations are allowed to file a consolidated tax return. However, because there was no common parent connecting BSG Ohio and BSG W.Va. through stock ownership, the Tax Court held that the two corporations were not members of an affiliated group under Sec. 1504. We agree.
 
 
 66
 On its tax returns for 1977 and 1978, BSG Ohio reported that it did not own 50 percent or more of the stock of any domestic corporation. Further, there is no evidence in the record to indicate that BSG W.Va. ever issued any stock at all. Thus, the two corporations were neither members of an affiliated group, nor were they entitled the file consolidated returns, as the Tax Court held.
 
 
 67
 Thus, we agree with the Tax Court's determination that BSG Ohio never lost its Subchapter S status in that it did not issue more than one class of stock, and it was not a member of an affiliated group.
 
 B
 
 68
 Finally, we must determine whether Jolin and Witte each owned one-half of the stock of BSG Ohio as of June 30, 1978, or whether the transfer of one-third of the stock to Monastra and Willhoit occurred before that date, leaving Jolin and Witte with only one-third of the stock each, as they urge us to find. The Tax Court held that, during the relevant time period, Jolin and Witte owned one-half of the stock each, and we agree.
 
 
 69
 Jolin and Witte allege that the 1977 joint venture agreement transferred one-third of the stock to Monastra and Willhoit at the time of its signing. Further, petitioners direct our attention to a resolution of the Board of Directors which stated that, as of June 1, 1977, the Board agreed to transfer one-third of the stock to Monastra and Willhoit, leaving Jolin and Witte with one-third of the stock each. In addition, a former employee of the petitioners, Karen Habersack, testified as to the extent of the power and control asserted over the corporation by Monastra and Willhoit. However, no documentary evidence, including stock books, minutes of meetings, stock certificates, or other corporate records were introduced to substantiate this testimony. Petitioners did introduce two financial statements allegedly prepared as of December 31, 1977, for submission to the FmHA and HUD showing that Jolin and Witte each owned one-third shares of the corporation.
 
 
 70
 We find the evidence and testimony supporting the petitioners' contentions to be unconvincing in light of the evidence to the contrary. For example, the Wittes' 1977 and 1978 tax returns indicate that the Wittes owned one-half of BSG Ohio during the years in question. Witte asserted that he owned one-half of the corporation as of June 30, 1978, in his petition filed in this case, as well as in his January 15, 1982, letter to the Internal Revenue Service. Monastra testified that neither he nor Willhoit had an interest in BSG Ohio until March 1979. This is consistent with BSG Ohio's corporate tax returns for 1978, which Monastra prepared.
 
 
 71
 After reviewing all of the evidence, we find no basis for overturning the Tax Court's determination that Jolin and Witte each owned one-half of BSG Ohio as of June 30, 1978.
 
 V
 
 72
 The petitioners have been unable to demonstrate that the Tax Court's determinations on any of the issues raised in this appeal were erroneous. We agree with that court's conclusions that BSG Ohio was a general partner in all four limited partnerships, and that the guaranteed payments should have been included in BSG Ohio's 1978 tax return. We further agree that BSG Ohio's Subchapter S status was not terminated, because the corporation did not issue more than one class of stock and was not a member of an affiliated group. Finally, we agree with the Tax Court's finding that Jolin and Witte each owned one-half of BSG Ohio during the relevant time period. Thus, finding no grounds for disagreement with the Tax Court, we AFFIRM.
 
 
 
 [1]
 Although the prospectuses contemplated multiple general partners, the Tax Court held that the only general partner was BSG Ohio. We shall at times refer to multiple general partners when referring to the parties' contentions